515 F.2d 964
 185 U.S.P.Q. 343
 KAISER INDUSTRIES CORPORATION, a Nevada Corporation
v.
JONES & LAUGHLIN STEEL CORPORATION.
KAISER INDUSTRIES CORPORATION, a Nevada Corporation, et al.
v.
JONES & LAUGHLIN STEEL CORPORATION, Appellant.
 No. 74-1312.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 22, 1974.
Decided April 4, 1975.
 
 Walter J. Blenko, Walter J. Blenko, Jr., Pittsburgh, Pa., Arthur J. Goldberg, Washington, D. C., William H. Webb, Webb, Burden, Robinson & Webb, P. A., Gordon R. Harris, Blenko, Buell, Ziesenheim & Beck, Pittsburgh, Pa., for appellant; T. A. Zalenski, Gerald K. White, Jones & Laughlin Steel Corp., Pittsburgh, Pa., of counsel.
 H. David Rosenbloom, Peter Van N. Lockwood, Richard E. Timbie, Caplin & Drysdale, Washington, D. C., for appellees; John M. Webb, David C. Bruening, Pittsburgh, Pa., Webb, Burden, Robinson & Webb, P. A., of counsel.
 Alexander Unkovic, P. Christian Hague, Meyer, Unkovic & Scott, Pittsburgh, Pa., Marcus B. Finnegan, Laurence R. Hefter, Kenneth E. Payne, Finnegan, Henderson, Farabow & Garrett, Washington, D. C., for amicus curiae, Crucible, Inc.; Clair X. Mullen, Jr., Crucible, Inc., Pittsburgh, Pa., of counsel.
 Before ADAMS, GIBBONS and WEIS, Circuit Judges.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 Before the landmark case of Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation[1] was catapulted onto the legal horizon, the rule was that no general collateral estoppel effect attached to a judicial determination of patent invalidity. In Blonder-Tongue, the Supreme Court held that a prior adjudication of invalidity may be asserted as a defense to a subsequent attempt to enforce the patent, and that such defense must be accepted unless it is demonstrated that the patentee was denied a full and fair opportunity to litigate in the earlier action.
 
 
 2
 The plaintiffs here sought to enforce a patent that had been held invalid in a previous suit.[2] The defendant asserted the defense of collateral estoppel, but the district court refused to accept it.[3] Since in the first suit the patentees were afforded a full and fair opportunity to litigate that satisfied the criteria established in Blonder-Tongue, we hold that the district court was obliged to accept the defense of collateral estoppel.
 
 
 3
 A. The Parties and the Cause of Action.
 
 
 4
 The patent in question,[4] referred to as the Suess patent, is the fundamental United States patent that teaches a process for producing steel by utilizing substantially pure oxygen to react with, and remove, impurities from molten pig iron. The "basic oxygen process," as it is commonly denominated, has been adopted by steelmakers throughout the world as a material technological advance over previously available processes for manufacturing steel.
 
 
 5
 The three plaintiffs in this case control the Suess patent in the United States and indeed throughout the world. They are VOEST,[5] a steel manufacturing company operated by the government of Austria, which presently owns the patent; BOT,[6] a European corporation formed by VOEST, Brassert and others to be the exclusive licensing agent for a group of patents involving oxygen steel production; and Kaiser Industries, the exclusive United States licensee of BOT. The defendant, Jones & Laughlin Steel Corporation, is a major United States steel producer.
 
 
 6
 Two cases are before the Court: one for royalties, filed by Kaiser in 1961 against Jones & Laughlin for alleged breach of a licensing agreement to use the Suess process at a plant in Aliquippa, Pennsylvania; and another, filed in 1961 by all three plaintiffs, for alleged infringement of the Suess patent by Jones & Laughlin at an unlicensed oxygen steel production plant in Cleveland, Ohio.6a The actions were begun in the Northern District of Ohio and removed to the Western District of Pennsylvania. There they were consolidated and tried without a jury. Judgment was for the plaintiffs and defendants appealed.
 
 
 7
 In light of our disposition of the over-arching issue of collateral estoppel, we need not address the other contentions presented, such as the patent's validity and the alleged infringement.
 
 
 8
 B. Steel Refining and the Advent of the Oxygen Process.
 
 
 9
 Reducing steel making to its essentials, iron is converted into steel via a two-step transformation.[7] In the first stage of the operation, the oxides contained in the iron ores are removed and the ore is reduced to pig iron. This process, known as smelting, is performed in a blast furnace.
 
 
 10
 It is the second step of the steel making operation, refining, that forms the backdrop for this litigation. The pig iron includes various chemical impurities, such as phosphorus, carbon, silicon, manganese and sulphur. Refining is directed to lowering the amounts of the impurities in the pig iron to levels congruent with desirable steel qualities, while at the same time avoiding the introduction into the steel of additional impurities such as nitrogen or oxides.
 
 
 11
 Several methods have been employed in modern times for the conversion of pig iron into steel.[8] The most efficient technique presently available for refining steel is the basic oxygen process, which jets a stream of high purity oxygen downward from above the surface of the molten metal bath. As practiced commercially, the advantages of the basic oxygen process are substantial. The resulting product is high quality steel, with low and controllable phosphorous and nitrogen content. And the steel can be rapidly manufactured in large batches, with relatively low capital and operating costs.
 
 
 12
 The remarkable success of the oxygen technique of steel refining is evidenced by the swift expansion of the industrial capacity for producing such steel. Most newly constructed facilities for the manufacture of steel adopt the basic oxygen method. The percentage of total steel produced by this process in the United States rose rapidly after the early 1960's and by 1970 oxygen steel production accounted for more tons of raw steel produced in the United States than the open hearth process.[9]
 
 
 13
 Initial efforts to refine steel utilizing pure oxygen forcefully propelled from above the bath surface were patented in Germany in 1943 by Schwarz,[10] and in Belgium, Britain and France, shortly thereafter, by Miles.[11] However, the specific techniques taught by Schwarz and Miles were never exploited commercially.
 
 
 14
 Experiments in Austria in 1949 produced superior results under a modified version of prior oxygen steel making. The Austrian experiments were conducted under the aegis of VOEST, a plaintiff in this case. In contrast to the earlier schemes, that taught deep penetration of the oxygen stream into the bath, the Austrians employed an oxygen jet of more moderate force, so that the oxygen did not penetrate so deeply into the bath. Under the new process, the oxygen, hitting on the center surface of the bath, reacts with impurities in the area of impact. The oxidized manganese and phosphorous leave the bath and float up into the slag layer that is created. The carbon monoxide that is produced by the process, however, is believed to form minute explosive bubbles that are driven downward toward the bottom of the vessel. Great heat is generated by the exothermic reactions at the point of oxygen contact, and a thermally induced circulation occurs inside the bath. The general circulation pattern is described as downward in the bath center, and around and upward along the sides of the hemispheric vessel. Because of the circulation pattern, unreacted portions of the bath are constantly exposed to the oxygen reaction area. The locally evolved heat at the reaction center is dissipated and absorbed in secondary, endothermic reactions along the sides of the refractory vessel.
 
 
 15
 On occasion, various elements of the multi-faceted physical-chemical Suess process have been singled out as the essence of the invention. However, in order to distinguish the Schwarz and Miles patents that teach that oxygen should be blown deep into the molten metal bath, emphasis has been consistently placed on avoidance of deep penetration by the oxygen stream, and the chemical and physical effects that flow therefrom.[12]C. Patenting the Suess Process.
 
 
 16
 After developing the concept of an oxygen jet of moderate force, the Austrians proceeded to seek patent protection. However, to avert conflict with the rather similar Schwarz patent, owned by Brassert, and in order profitably to commercialize the basic oxygen process, VOEST and Brassert in 1952 formed an exploiting firm, the plaintiff BOT. By agreement, BOT acquired exclusive rights to license oxygen steel making patents controlled by either of the partners. Pursuant to the plan of the parties, BOT licensed plaintiff Kaiser in 1954 as its sole licensee in the United States. Once the United States patent for the Suess process was secured, rights under the Austrian process thus accrued to Kaiser.[13]
 
 
 17
 The original filing for the United States patent that forms the basis for the present suit was by Suess, in 1951. Suess applied for the patent in his own name and designated himself as sole inventor. However, in 1955, VOEST succeeded to the world-wide patent rights of Suess, and both BOT and Kaiser thereby acquired a derivative interest in any United States patent that issued to VOEST on the basic oxygen process developed by Suess. A short time later, three Austrian co-workers of Suess, Drs. Trenkler, Rinesch and Hauttmann, were included in the patent application as co-inventors of the process.
 
 
 18
 The Suess application followed a labyrinthine course through the United States Patent Office, only a limited portion of which is relevant here. Ultimately, the 1951 claims and specification were definitively rejected by the Patent Office and abandoned by the plaintiffs.[14]
 
 
 19
 A continuation-in-part application covering the same invention was filed November 16, 1955. The specification of the continuation application contained a more particularized discussion of the procedures to be followed in practicing the basic oxygen method. It concluded with fifteen new claims, the first four advocating, as a critical element in the invention, the avoidance of deep penetration by the oxygen jet. All the new claims were rejected by the Patent Office on June 14, 1956, because the claimed invention was covered by prior patents, including the Miles patent and an early Brassert patent.[15] The patentees thereupon amended the application on December 7, 1956, cancelling claims 1 through 10, resubmitting claims 11 through 15 with only minor changes, and adding claim 16, incorporating the concept of avoidance of deep penetration. Documentation accompanying the modified submission distinguished the Miles patent "in the very important particular of depth of penetration" by the oxygen jet. It continued,
 
 
 20
 (We are) emphasizing a much lower impingement pressure and a practically negligible penetration of the surface of the molten metal by the oxygen jet. As pointed out at length in the specification . . . it is of utmost importance . . . to avoid deep penetration of the molten metal by the oxygen or air blast.[16]
 
 
 21
 The claims were totally revised on June 11, 1957. The patentees advised the Patent Office: "The claims of the application are cancelled and new claims No. 17 and No. 18 are substituted therefor in view of the discussion with the (Patent Office) examiner on May 1, 1957. . . . The new claims are believed to be properly definitive of the invention."[17] The two new claims do not by their terms advert to the depth of penetration by the oxygen jet. However, accompanying the new claims were affidavits from two of the inventors, Drs. Rinesch and Hauttmann, that did discuss the question of oxygen penetration and expanded generally on the experimental and theoretical background of the basic oxygen process. No alterations were made in the specification when the new claims were filed.
 
 
 22
 On June 17, 1957, six days after the new claims were filed, and following a final conference with the Examiner that took place on June 14, 1957, one minor amendment was inserted in the first new claim. This amendment rendered the patent application acceptable to the Patent Office. As a result, the application was allowed on June 27, 1957, and the Suess patent was issued July 23, 1957.[18]
 
 
 23
 The specification in the patent that issued described a process whereby steel was refined by using a high speed jet of pure oxygen directed vertically downwards onto a bath of molten metal, through an early-formed slag layer, in a manner so as to avoid deep penetration of the metal bath by the oxygen. By contrast, the patent claims did not mention the avoidance of deep penetration. Instead, the claims read as follows:
 
 
 24
 1. Method of refining molten impure iron in the presence of a slag in a vessel having a refractory lining by blowing with oxygen, which comprises discharging a stream of oxygen vertically downwardly through the slag layer onto and below the surface of the bath at the central portion thereof, to an extent to avoid material agitation of the bath by the oxygen stream, the contact of the oxygen with the bath resulting in reaction of the oxygen with a portion of the iron and with the oxidizable impurities of the bath in a localized reaction zone spaced a substantial distance from the refractory lining, the reactions in said zone resulting in refining of the iron and gas evolution and in the production of high temperature in the reaction zone away from the refractory lining, said reaction producing a circulatory movement in the molten metal, which circulatory movement brings those portions of the molten metal bath which are remote from the reaction zone into the reaction zone whereby those portions are subjected to said reaction with minimum injury to the refractory lining.
 
 
 25
 2. The gaseous oxygen process set forth in claim 1 in which the oxygen is blown into said vessel under pressure in a range between about five and about twenty-five atmospheres above normal atmospheric pressure. (emphasis added).
 
 
 26
 D. Litigation Respecting the Suess Patent: The McLouth Case.
 
 
 27
 Several years prior to the issuance of the Suess patent, McLouth Steel Corporation, a United States manufacturer, sent representatives to confer with the Austrians. McLouth resolved to integrate the new oxygen process in its facility then being developed. Accordingly, McLouth entered into a contract with Kaiser in November, 1954, under which Kaiser would give advice and assistance to McLouth.
 
 
 28
 1. Proceedings in the Michigan District Court.
 
 
 29
 After McLouth's oxygen steel-making plant was in production, Kaiser determined that McLouth was conducting an unlicensed infringing operation. Consequently Kaiser, together with VOEST and BOT, brought suit in the Eastern District of Michigan on July 19, 1957, four days before the Suess patent issued, claiming infringement of the Cuscoleca patent, which plaintiffs also control.[19] A subsequent amendment to the complaint substituted the Suess patent for the Cuscoleca patent.[20]
 
 
 30
 McLouth admitted the use of the Austrian process, but predicated its defense on the assertion that, for a variety of reasons, Kaiser did not possess an enforceable patent. Among its contentions, McLouth attacked the Suess patent process as anticipated by prior art, specifically by the Schwarz and Miles patents,[21] and as obvious to one skilled in the art at the time of the invention.[22] McLouth also asserted that the patentees had not invented the process.[23] Additionally, McLouth urged invalidation of the Suess patent because of indefiniteness, alleging that neither the claims nor the specification of the Suess patent satisfied the statutory requirements embodied in 35 U.S.C. § 112, and contending that the specification did not support the claims of the Suess patent.
 
 
 31
 The district court proceedings in McLouth were prodigious, and characterized by the district court in that case as follows:
 
 
 32
 The litigation has been unusually long and complex. After several years of pretrial research, experimentation and discovery, the case came to trial in October, 1963. Trial of the case required 150 days of court time, spread over an entire calendar year. More than 13,800 pages of testimony were taken, consisting largely of scientific evidence, much of which required the use of interpreters. A great number of exhibits were received in evidence, including large testing equipment, test pieces, and many demonstration movie films, as well as a considerable volume of documentary evidence. At the conclusion of the trial, briefs were prepared and submitted by the parties, totaling nearly 1000 printed pages. Final arguments lasted five days. . . . The testimony and documentary exhibits in (bound) form occupy approximately (equal amounts) of library shelf space, totaling more than twelve feet.[24]
 
 
 33
 In addition to the evidence received in the form of expert testimony and documents, the Michigan district judge undertook a site visit to the McLouth plant. He also witnessed a series of experiments in a University of Michigan metallurgy laboratory.
 
 
 34
 The conclusions of the Michigan district court were announced in an opinion of 70 printed pages filed July 16, 1966.[25] The court accorded appropriate recognition to the statutory presumption of patent validity,[26] and to the heavy burden of proof on one who would overcome a patentee's rights under the Constitution and statutes. The basic oxygen process patented by Suess was determined to confer "substantial advantages (which) . . . quickly became apparent."[27] "The remarkable success of the (basic oxygen process was) dramatically illustrated"[28] by statistics relating to recent steel plant construction and annual capacities. The Michigan district court expressed the view that revolutionary patents such as Suess merit a liberal construction.[29]
 
 
 35
 Attacks on the patent's validity were addressed seriatim by the Michigan court. After a careful discussion, it found unpersuasive McLouth's contentions that the Suess patent was anticipated by prior art, was obvious, lacked inventorship, and that the specification did not satisfy the statute.
 
 
 36
 The Michigan court then turned to a consideration whether the claims of Suess satisfied section 112. Section 112 provides in pertinent part:
 
 
 37
 The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.
 
 
 38
 In this regard the Michigan court determined that there were three statutory mandates that had not been met and that, therefore, the Suess patent was void for indefiniteness.
 
 
 39
 First, it ascertained that the claims of the patent do not properly measure the invention:
 
 
 40
 (T)he avoidance of deep penetration is clearly the subject matter which applicants regarded as their invention, and yet the concept of the avoidance of deep penetration simply cannot be read into the claims of the patent in suit. The language of the claims admittedly does not refer expressly to the avoidance of deep penetration of the bath by the jet (R.13,772), nor can any language of the claims be construed to contain such a meaning.[30]
 
 
 41
 In response to the assertion, pressed vigorously by Kaiser, that the claim language, "avoid material agitation," incorporated the notion of avoidance of deep penetration, the Michigan court gave its reasons for being unable to find a causal relationship between the key terms "agitation" and "penetration." Undeniably, no causal relationship was defined within the four corners of the patent. In addition, as a logical proposition it appeared to the Michigan court "that even deep penetration would avoid material agitation as defined by plaintiffs."[31]
 
 
 42
 Supplementing the foregoing grounds of decision, the Michigan court found "a further reason why the actual invention of the patentees cannot be read into the claims of the patent in suit."[32] The Patent Office had earlier been presented with claims by Suess that expressly identified "avoidance of deep penetration" as an "essential feature" of the invention. These claims were rejected by the Patent Office and later cancelled by Suess. The Michigan court found that the applicant acquiesced in the Patent Office rejection of the claim, "the cancellation of which amounts to a disclaimer."[33]
 
 
 43
 The Michigan court held that the patentees were bound by their choice to submit an alternative description rather than to appeal the rejection. The conclusion of the Michigan court was based on Schriber-Schroth Co. v. Cleveland Trust Co., where the Supreme Court expounded the doctrine of file wrapper estoppel:
 
 
 44
 It is a rule of patent construction consistently observed that a claim in a patent as allowed must be read and interpreted with reference to claims that have been cancelled or rejected and the claims allowed cannot by construction be read to cover what was thus eliminated from the patent. . . .[34]
 
 
 45
 The second issue under section 112 was whether the patent claims found support in the specification. The Michigan court applied the "well-established principle of patent law that the claims of a valid patent must be supported by the specification."[35] Here again, the Michigan court found the patent wanting, since several steps of the claims were not defined or described adequately in the specification.
 
 
 46
 In particular, the Michigan court could discover no support in the specification for any reasonable interpretation of the claim language, "to avoid material agitation of the bath by the oxygen stream." The court undertook a careful review of relevant legal precedent, of the exact language of the claims and the specification of the patent, and of expert testimony. It painstakingly considered Kaiser's contention that the specification did in fact teach the subject of the claim.
 
 
 47
 However, the Michigan court concluded from the evidence that the notion of material agitation by the oxygen "is a fiction,"[36] because the violent chemical reactions taking place occasioned so much agitation that no effect from the oxygen was discernible. Furthermore, experts did not appear to understand what the claim language meant. While the language used in the specification, "avoidance of deep penetration," was perhaps a claimable invention, the court was unable to locate any teaching in the specification that would correlate the concept disclosed in the specification (avoidance of deep penetration) to the concept claimed (avoidance of material agitation). Nor, the Michigan court found, would such a relationship be apparent to those skilled in the art.
 
 
 48
 As an additional reason for not reading the specification to fulfill the language of the claim, the Michigan court again expressed its understanding that it was bound by the doctrine of file wrapper estoppel. Under the file wrapper doctrine, it held, the language that had been cancelled from a claim could not be reinserted in an allowed claim by the process of interpretation.
 
 
 49
 By a similar analysis, the Michigan court found no support in the specification for the claim language of a chemical "reaction producing a circulatory movement in the molten metal" or that the oxygen was to be blown "below the surface."
 
 
 50
 There was yet another ground in McLouth for disallowing the patent claims under section 112. Contrary to the requirements of patent law, the Michigan court held, the claims are not restricted to the invention since they cover prior art. "(Because of the) broad scope of the claims, . . . even a person practicing the prior art would infringe the process of the claims."[37]
 
 
 51
 In capsule form, the Michigan court found the Suess patent invalid under section 112 on three independent grounds: the claims did not measure the invention, the claims were not supported by the specification, and the claims covered prior art. In the course of its opinion, the Michigan court mentioned that it was unfortunate that the patentees had not pursued more insistently their original claims, advocating avoidance of deep penetration, since such claims appeared more likely to form the basis of a valid patent.2. Proceedings in the Sixth Circuit.
 
 
 52
 The judgment of invalidity based on the opinion by the Michigan court was appealed to the Sixth Circuit. The four points argued by Kaiser to the Sixth Circuit were (1) whether the doctrine of file wrapper estoppel precluded a construction of the Suess claims incorporating the concept of avoidance of deep penetration; (2) whether the claims defined the invention sufficiently to satisfy section 112; (3) whether the claims were adequately supported by the specification; and (4) whether the claims over-reached so as to cover prior art.[38]
 
 
 53
 As to the file wrapper estoppel, the sole contention pressed by Kaiser in the Sixth Circuit was that the Michigan district court had misconstrued the doctrine. Kaiser argued to the Sixth Circuit, "The doctrine of file wrapper estoppel has no application in those cases where nothing has been surrendered by the applicant to get his patent or where, as here, there was a mere rephrasing of the claims in an effort to put them into more apt language. . . ."[39] Kaiser, asserting that avoidance of deep penetration was and always had been considered the gist of the patentee's invention, took the position that it had never abandoned this concept during the Patent Office proceedings. No argument was advanced that Kaiser was unaware that the file wrapper estoppel question would arise in the Michigan court, and was therefore deprived of an opportunity to present evidence on such issue.
 
 
 54
 The Sixth Circuit filed its opinion affirming the Michigan court on August 2, 1968. It expressly approved the manner in which the district court had conducted the trial:
 
 
 55
 The handling of the protracted trial on infringement by the District Judge was a monumental task, which he performed ably and well. . . .[40]
 
 
 56
 Although it declined to embrace every determination by the trial court, the Sixth Circuit concluded that the Suess patent was invalid because the claims did not particularly and distinctly claim the invention described in the specification.[41] Further, the Sixth Circuit upheld the district court's conclusion that the language actually used in the claim avoid material agitation "had no meaning to one skilled in the art."[42] Finally, the Sixth Circuit held that the claim reached impermissibly beyond the invention, to encompass prior art. It viewed such a claim as an improper attempt to extend a patent monopoly, and stated that the remedy for such an attempt would be to invalidate the patent.[43]
 
 
 57
 Two members of the Sixth Circuit panel found that file wrapper estoppel would foreclose a court from reading the phrase "avoid deep penetration" into the claim of the Suess patent. Relying on Schriber-Schroth[44] the majority held:
 
 
 58
 We believe that sound inferences can be drawn from the Patent Office's rejections of earlier claims which contained the element of avoidance of deep penetration and its reference to the Cuscoleca Patent. Although the record is void as to the content of the discussion with the Examiner on May 1, 1957, we believe that an inference of abandonment can be drawn from the omission of "avoidance of deep penetration" from the final claims. In our opinion, if the element was as important as the affidavits imply, it would have been explicitly included in the claims; the Patentees were well aware that our patent laws require that the claims "distinctly" claim the alleged invention. The appellants cannot regain the phrase or qualify the effect of their acquiescence through the affidavits. Parke, Davis & Co. v. American Cyanamid Co., 207 F.2d 571, 574 (6th Cir. 1953). In the face of prior rejections, the claim allowed, cannot, by construction or affidavit, be read to cover that which was specifically abandoned by the patentee so as to give the allowed claim a scope it might have had without the omission of the language.[45]
 
 
 59
 With regard to the factual determination whether the patentees abandoned their claim of deep penetration, the court of appeals expressed the view that "abandonment is established if a phrase used in an abandoned or rejected claim is not used in a later accepted claim."[46]
 
 
 60
 The third judge on the Sixth Circuit panel joined the opinion in all respects except that portion dealing with file wrapper estoppel. His determination of patent invalidity was based flatly on the failure of the patentee's claims to satisfy the definiteness requirement of section 112.
 
 
 61
 A petition for certiorari posing, inter alia, the question whether the file wrapper estoppel issue was correctly decided, was denied by the Supreme Court on March 3, 1969.[47]
 
 
 62
 E. Litigation Respecting the Suess Patent: Proceedings in the Western District Court.
 
 
 63
 After several years of pretrial proceedings, the trial of this case for contract royalties and patent infringement began in the District Court for the Western District of Pennsylvania, on October 23, 1967. It continued with some interruptions until its conclusion on March 14, 1968.
 
 
 64
 In the period between trial and decision the record in the Western District of Pennsylvania was twice re-opened. In September, 1969, the district court granted a motion by plaintiffs to open the record in order to submit evidence relating to file wrapper estoppel.[48] The following April, there was filed a deposition by the Patent Office Examiner who had been responsible for final approval of the Suess patent. Also, testimony was received from the patentees' attorney, who had been present at the May 1, 1957 interview at the Patent Office that had preceded the claim revision. The attorney testified that, consistent with Patent Office policy favoring positive formulations, the substitution of the claims just prior to issuance was intended to convey a more positive concept of localized penetration, in preference to the negative language, namely, "avoidance of deep penetration."[49] He alleged that there had been no intention to abandon the concept of avoidance of deep penetration, and that the change in words did not reflect an abandonment of the theory of the invention.
 
 
 65
 A second re-opening occurred the following year, in 1971, when Blonder-Tongue[50] was announced by a unanimous Supreme Court. As previously indicated, Blonder-Tongue decreed that the defendant in a patent infringement action may assert a plea of collateral estoppel based upon a final determination of patent invalidity in a prior infringement case brought by the patentee, even though the earlier suit was against a different party.
 
 
 66
 The watershed decision in Blonder-Tongue radically altered the posture of the present case, then pending before the Western District Court. It became incumbent on that court to ascertain the collateral estoppel effect of the McLouth determination. Additional hearings and argument were scheduled in September, 1971 regarding the import of Blonder-Tongue and the file wrapper estoppel issue. Witnesses included the former Commissioners of Patents and other experts in Patent Office practice.
 
 
 67
 Final argument was heard in December, 1971. In January, 1974, the Western District Court decided the case in three comprehensive opinions totaling nearly 800 pages.[51] These opinions are devoted in substantial measure to the collateral estoppel question. The Western District Court concluded that Blonder-Tongue did not require that it accept the defense of collateral estoppel in the situation presented. To assess the correctness of the determination of the Western District Court in this respect, it is necessary to examine in detail the rule announced in Blonder-Tongue.
 
 
 68
 F. The Blonder-Tongue Decision.
 
 
 69
 In Blonder-Tongue[52] the Supreme Court partially overruled the holding of Triplett v. Lowell[53] and in the context of actions for patent infringement jettisoned the rule that "the estoppel of a judgment must be mutual."[54] The Court unanimously held that, where a patent had been declared invalid in a prior adjudication, an unrelated defendant in a subsequent action for infringement may assert a collateral estoppel defense based on the previous judgment.[55] In reaching its decision, the Supreme Court discussed at length the singular qualities of patents, and the special characteristics of patent litigation. The outcome was the creation of a pragmatic formula that harmonized considerations of due process and judicial economy. It was aimed at producing substantial justice while avoiding needlessly repetitious litigation.
 
 
 70
 The Supreme Court considered and rejected the notion that patents were per se so complex that a rule permitting infinite litigation of patent validity was required. Many of the issues involved in deciding questions of patent validity, it was stated, do not require any scientific training to resolve. Even in complicated patent cases, the Court noted, there is no reason to expect that further litigation will produce a better result than the initial determination.
 
 
 71
 In justifying use of the estoppel defense against a patentee by an unrelated defendant, the Court emphasized that the patentee in Blonder-Tongue had enjoyed both the initiative and incentive in the prior litigation. The patentee in Blonder-Tongue had been plaintiff in the first case,[56] and thus chose the party to sue and determined the time and place of the litigation. These elements are also found in the present case. The plaintiffs here, Kaiser, BOT and VOEST, took the initiative in McLouth and made the decision when and where to file suit.
 
 
 72
 Additionally, mindful of the deliberate nature of patent litigation, and the high stakes that can turn on a question of patent validity, the Supreme Court in Blonder-Tongue cautioned:
 
 
 73
 Presumably (the patentee) was prepared to litigate and to litigate to the finish against the defendant there involved. . . . (T)here is no reason to suppose that plaintiff patentees would face either surprise or unusual difficulties in getting all relevant and probative evidence before the court in the first litigation.[57]
 
 
 74
 It cannot reasonably be maintained that there was a want of incentive for a vigorous litigation in the McLouth case. First, the action involved very substantial amounts of money. Second, even under the mutuality requirement of Triplett, there were potential collateral estoppel effects. The McLouth company itself, for instance, could open new steel plants that utilized a process covered by the Suess patent. In any infringement action brought by Kaiser regarding such subsequent plants, the parties and the issue of patent invalidity would be the same as in the first McLouth case. The holding of patent invalidity from the first McLouth case, therefore, would provide a successful collateral estoppel defense to McLouth in such later suits. Since nearly all new steel manufacturing installations were then adopting the basic oxygen process, this hypothesis is not unrealistic. We are therefore persuaded that Kaiser had adequate incentive to litigate fully in the McLouth case.
 
 
 75
 In the initial trial of the patent at issue in Blonder-Tongue, the plaintiff, having lost in the district court after a disposition on the merits, appealed to the court of appeals. That court affirmed and the plaintiff petitioned unsuccessfully for certiorari on the question of patent validity. This procedural history contributed to the Supreme Court's conclusion that the previous patent trial had been diligently pursued "to the finish." The litigation in McLouth followed a parallel course procedurally. And there can be no doubt that the McLouth litigation was also "to the finish."
 
 
 76
 Consequently, we conclude that, from the standpoint of initiative in bringing suit, incentive to litigate, and full exercise of appellate rights, McLouth is essentially identical with the original case reviewed in Blonder-Tongue.
 
 
 77
 However, even where a defense of collateral estoppel may be appropriately raised, the Supreme Court did not mandate its unqualified acceptance. Instead, under Blonder-Tongue, before collateral estoppel is determined, the patentee must be allowed "to demonstrate, if (it) can, that (it) did not have 'a fair opportunity procedurally, substantively and evidentially to pursue (its) claim the first time.' "[58]
 
 
 78
 Under the Supreme Court holding, the correctness of the result of the earlier patent suit is not at issue.[59] Indeed, the sole ground explicitly recognized by the Supreme Court to defeat a motion for summary judgment made in the second case and premised on Blonder-Tongue is that the first adjudication did not provide a "full and fair opportunity to litigate."
 
 
 79
 The Supreme Court set forth criteria to guide the second trial court in its determination whether to reject the defense of collateral estoppel:
 
 
 80
 Determining whether a patentee has had a full and fair chance to litigate the validity of his patent in an earlier case is of necessity not a simple matter. In addition to the considerations of choice of forum and incentive to litigate mentioned above, certain other factors immediately emerge. For example, if the issue is non-obviousness, appropriate inquiries would be whether the first validity determination purported to employ the standards announced in Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); whether the opinions filed by the District Court and the reviewing court, if any, indicate that the prior case was one of those relatively rare instances where the courts wholly failed to grasp the technical subject matter and issues in suit; and whether without fault of his own the patentee was deprived of crucial evidence or witnesses in the first litigation. But as so often is the case, no one set of facts, no one collection of words or phrases, will provide an automatic formula for proper rulings on estoppel pleas. In the end, decision will necessarily rest on the trial courts' sense of justice and equity.[60]
 
 
 81
 The guidelines suggested for reaching a result permitting relitigation are replete with qualifying words making a patentee's burden onerous. In effect, a patentee must persuade a second trial court "that the prior proceedings were seriously defective."[61]
 
 
 82
 After enumerating particular factors, the Supreme Court stated that the decision whether to adopt the estoppel defense is entrusted finally to "the trial courts' sense of justice and equity." We do not interpret the phrase "justice and equity" to constitute a departure from the exacting language used by the Supreme Court earlier in the same paragraph of its opinion.[62] Rather, the phrase indicates that each case merits individual consideration before a district court rules on an estoppel plea and, possibly, that other extraordinary grounds, not expressly mentioned, may provide the necessary foundation for denying a collateral estoppel defense in individual cases.
 
 
 83
 It is suggested by Kaiser that generalized concepts of justice and equity constitute an independent ground for denying an estoppel defense, and that a determination whether such independent ground exists should rest in the discretion of the trial court. We cannot acquiesce to a meaning of the words "justice and equity" that would permit unarticulated and unreviewable determinations when a district court refuses a plea of collateral estoppel in patent litigation.
 
 
 84
 Courts have on several occasions been presented with particular factual circumstances that patentees contended justified relitigation on grounds of justice and equity. Most such situations could be comprehended under a broad interpretation of the concept of a full and fair opportunity to litigate the validity of a patent. For example, where appellate review has been foreclosed, parties have maintained that estoppel of judgment should be inoperative.[63] Patentees have also objected to estoppel predicated on patent invalidity when the first trial procedure was unorthodox.[64] In the Blumcraft cases,[65] estoppel was unsuccessfully contested on grounds of justice and equity where two prior decisions had divided on the question of the patent validity. Attempts to elude estoppel based on considerations of justice and equity have, since the Blonder-Tongue decision, generally failed.[66]
 
 
 85
 The Western District Court reasoned that, since the law favors inventiveness, considerations of justice and equity made collateral estoppel inapplicable.[67] This observation, of course, would be equally apposite to every patent case, and would perforce eliminate substantially all collateral estoppel under the new Blonder-Tongue precept. The Western District's reliance on justice and equity would appear to overlook the significance of the prior judgment of invalidity. Its rationale is also at odds with the thrust of the Supreme Court discussion, emphasizing the paramount public interest in maintaining patent monopolies only where appropriate.[68]
 
 
 86
 We thus are unable to support the Western District Court's basis for invoking principles of equity and justice. While it may be that some combination of circumstances based on independent equitable considerations might arise to warrant denial of estoppel, we perceive nothing on the facts here that would indicate such a result.
 
 
 87
 We also take cognizance that this Circuit has long been in the vanguard of an amplified application of collateral estoppel principles. In 1950, Judge Hastie anticipated Blonder-Tongue when in Bruszewski v. United States,[69] a non-patent case, he abandoned the mutuality requirement and held the plaintiff estopped from relitigating a liability issue he had tried and lost in a former case against a different defendant. Since then, the Third Circuit has "adopted a rather expanded view" regarding collateral estoppel[70] and, at least for defensive purposes, collateral estoppel may be asserted without mutuality "unless some overriding consideration of fairness to a litigant dictates a different result."[71]
 
 
 88
 G. Application of Blonder-Tongue to the Present Case.
 
 
 89
 The Western District Court decided that, in the present case, no collateral estoppel effect should be conferred on the former judgment.[72] The Michigan court in McLouth, it is recalled, had held the Suess patent to be invalid, and the Sixth Circuit affirmed. In brief, the McLouth courts had decided that the claims of the patent failed in several respects to conform to the patent statute, and that the interpretation urged by the plaintiffs was legally impermissible by reason of the doctrine of file wrapper estoppel.[73] Thus, before the Western District Court could appropriately reject collateral estoppel in the present case, it had to find that each of these two bases of decision was unreliable under the Blonder-Tongue guidelines.[74]
 
 
 90
 In considering the issue of collateral estoppel, the Western District Court undertook an extensive investigation of the McLouth case. It re-examined not only the opinions but the entire record and briefs of McLouth with minute attention to detail. The Western District extended its study beyond the record of McLouth and consulted outside authorities to aid its understanding. The method of analysis pursued by it was to advance point by point through the McLouth opinions and, at each juncture, to provide the reader with a critique of the support in the record on which the Michigan court and Sixth Circuit opinions rely.[75]
 
 
 91
 The Western District Court, purporting to employ the criteria of BlonderTongue, first ascertained that the matter before it was indeed "one of those relatively rare instances where the courts wholly failed to grasp the technical subject matter and issues in suit."[76] In particular, it stated that the trial court in McLouth "wholly failed to grasp" the "true invention" of the patentees,[77] namely, the separation of the reactions into two chemical components: a heat generating (exothermic) portion and a heat absorbing (endothermic) portion.
 
 
 92
 Moreover, the Western District Court found that, by concentrating excessively on the concept of "avoidance of deep penetration" and emphasizing the mechanical, physical aspects of the process to the exclusion of the chemical phenomena, the Michigan court had reached a totally fallacious conception of the invention.[78] Affirmance of the Michigan court by the Sixth Circuit, the Western District Court maintained, was based upon the same misconception of the invention.[79] Once it resolved that the McLouth courts wholly failed to grasp the scientific process at issue, the Western District accordingly found that no estoppel effect attached to the McLouth determination that the claim language of the Suess patent did not satisfy the requirements of section 112.
 
 
 93
 In order to overcome the estoppel effects of McLouth entirely, the Western District Court was also forced to call into question the second basis for the holding in McLouth, that file wrapper estoppel foreclosed the interpretation of the Suess patent urged by Kaiser. On this matter, the Western District stated that the Michigan court had raised the issue of file wrapper estoppel sua sponte.[80] The Western District reasoned, therefore, that under the Blonder-Tongue guidelines, Kaiser had been prevented, without fault of its own, from presenting evidence on the crucial issue whether the language "avoid deep penetration" had been abandoned by the patentees. After receiving evidence on the question of file wrapper preclusion, the Western District was persuaded that no abandonment of the patentable concept, avoidance of deep penetration, had in fact occurred during the Patent Office proceedings. Consequently, it held that the language appearing in the Suess claims could be read to include the patentable invention which the Western District Court found was described in the specification.
 
 
 94
 For these two reasons, the Western District determined that the McLouth decisions provided no estoppel defense, and it was thereby free to draw its own conclusions regarding patentability and file wrapper estoppel from the evidence before it. The Western District Court thereupon held that the Suess patent was valid, and that the defendant had infringed it. Judgment was granted for plaintiffs.
 
 
 95
 We are asked to review, as a matter of law, whether the Western District Court properly interpreted and applied the Blonder-Tongue standards regarding collateral estoppel.
 
 
 96
 1. Alleged Deprivation of Crucial Evidence.
 
 
 97
 Although there is some dispute about the admissibility and probity of such evidence as Kaiser produced in the Western District Court,[81] we accept arguendo Kaiser's assertion that such evidence was admissible and helpful to it. Nonetheless, we cannot agree that the absence of this evidence in McLouth vitiates the collateral estoppel effect of the earlier determination. In McLouth, claims Kaiser, inadequate evidence was presented to resolve the question whether Kaiser in fact abandoned its concept of "avoid deep penetration" by removing that language from the claim and inserting the phrase, "avoid material agitation." Since this matter was raised sua sponte by the Michigan court after the evidence was closed, Kaiser contends, it was thereby deprived of an opportunity to present testimony disproving the conclusion reached by the Michigan court.
 
 
 98
 We have carefully studied the relevant papers in McLouth, including the trial and appellate briefs and opinions, regarding the issue of file wrapper estoppel. In the course of examination it has been helpful to refer to the McLouth record. We have considered the Supreme Court cases that are relied on in the Sixth Circuit as the framework for the latter court's holding on file wrapper estoppel.[82] And we have reviewed carefully the opinion of the district court in this case.[83]
 
 
 99
 In order to show that a prior judgment is not binding for want of essential evidence, a patentee must fulfill the two criteria of the Supreme Court test. It must persuade the second court that the additional evidence was crucial to a proper resolution in the first tribunal, and that the patentee bore no responsibility for the absence of the evidence in the prior trial. Kaiser has not shown either element.
 
 
 100
 First, since the Michigan court invalidated the Suess patent on independent grounds of indefiniteness under section 112, the file wrapper estoppel evidence may be described as "crucial" only if the indefiniteness ground of decision fails. However, for purposes of collateral estoppel, we must accept the McLouth invalidation of the Suess patent based on the inadequacy of the claims under section 112, unless the Michigan court did not comprehend the case or, specifically, that issue. We do not find the Michigan decision so infirm.83a Hence, the file wrapper evidence is not crucial.
 
 
 101
 Second, even assuming the file wrapper evidence is crucial, we are also unable to hold that Kaiser was blameless as to the lack of evidence regarding this issue. On appeal to the Sixth Circuit, Kaiser had the opportunity to complain about the matter of reliance sua sponte by the Michigan court on file wrapper estoppel. Kaiser chose to dispute neither the procedural manner in which the file wrapper issue was raised by the Michigan court, nor the fact that Kaiser was not given an opportunity at the trial to present evidence on file wrapper estoppel. Instead, Kaiser in the Sixth Circuit relied on the legal argument that no file wrapper estoppel should obtain where "nothing has been surrendered . . . there was a mere rephrasing of the claims,"[84] and where affidavits accompanying the new claims explained the new terminology. The Sixth Circuit majority rejected Kaiser's contentions regarding the legal effect of the patentee's actions on the Patent Office.
 
 
 102
 Now Kaiser assumes a different posture and raises objections to the McLouth proceeding that are bottomed, not on the legal aspects of file wrapper estoppel, but rather on the foreclosure of evidence. In the absence of a compelling reason why it could not have raised this objection at the time of the McLouth appeal, Kaiser is not at liberty to voice such a protest here.
 
 
 103
 The reasons advanced for the evidentiary omission in the McLouth case do not excuse Kaiser for its failure to raise the subject of the file wrapper estoppel evidence.[85] The Western District Court stated that Kaiser did not argue the evidentiary point in McLouth because Kaiser relied on the Sixth Circuit to reverse the Michigan court as a matter of law. But this tactical determination hardly constitutes an event in which Kaiser is without fault.
 
 
 104
 It is also suggested that Kaiser's motivation to litigate was reduced because, at the time Kaiser was on trial in McLouth, the rule of Triplett was the law and therefore the scope of loss as to Kaiser was limited. We have noted above that the consequences to plaintiffs of a defendant victory in McLouth were sufficiently grave to provoke a vigorous prosecution of that case, even in the absence of the Blonder-Tongue rule.[86] No additional reasons have been urged to excuse Kaiser's failure to raise the matter on appeal in McLouth, nor can the Court discern any.
 
 
 105
 Thus, the McLouth proceedings do not disclose that Kaiser's right to a fair and full opportunity to litigate the issue of file wrapper estoppel was diminished to any degree by an inability to present crucial evidence without fault of its own. Accordingly, the Western District Court erred in receiving and considering evidence on the substantive issue of file wrapper estoppel,[87] and its judgment on file wrapper estoppel cannot be sustained.
 
 
 106
 2. Alleged Failure by McLouth Courts to Grasp the Subject Matter and Issues.
 
 
 107
 We next focus on the determination by the Western District Court that the McLouth courts "wholly failed to grasp" the scientific nature of the patented process and, consequently, that their judgments are not entitled to collateral estoppel value. We have painstakingly read the McLouth opinions and briefs, in concert with the claims and specification of the Suess patent. In addition, we have studied the case law on which the McLouth courts relied in finding the patent invalid for indefiniteness under 35 U.S.C. § 112.[88] Our review has included a careful evaluation of the Opinion, Summary and Compendium of the Western District Court.
 
 
 108
 Unlike the Western District Court, we are led to the unequivocal conclusion that the McLouth tribunals did not "wholly (fail) to grasp the technical subject matter and issues in suit" in deciding the validity of the Suess patent. The documentary evidence refutes the possibility that the McLouth courts were so misguided.[89]
 
 
 109
 A substantial number of factors contribute to our conviction. Judge Freeman, the district judge in McLouth, allocated an unusual amount of time to the trial, and devoted considerable effort to understanding the underlying industrial and scientific principles. He was alert to the contentions of the parties and "keenly aware of the issues for decision."[90] This is evidenced by Judge Freeman's reading of voluminous documents, his presence at experiments scheduled for his edification, and his close attention to questioning at trial, all recited in his opinion. Moreover, the judge himself conducted intelligent questioning of counsel and expert witnesses during the trial and arguments.[91]
 
 
 110
 The Michigan court produced a comprehensive and comprehensible opinion, where extensive evidence was marshalled in an orderly and readily-digested fashion. A description of general steelmaking procedures was followed by a detailed discussion of the basic oxygen method. The exposition of the oxygen process revealed that the writer possessed a sure understanding of what occurred, chemically as well as physically, during the basic oxygen process. Finally, the Michigan court undertook a meticulous legal analysis of the requirements of definiteness under Section 112.
 
 
 111
 It would be unseemly to claim that the Michigan court did not understand the theories of the parties or ignored the evidence before it. Throughout the opinion, it supported its findings with extensive citations to the record. Indeed, the gist of the invention as found by the Michigan court, and affirmed on appeal, was precisely the definition advanced by the plaintiffs.
 
 
 112
 On appeal, no contention was heard that the Michigan court had misdefined or misunderstood the plaintiffs' invention. The facts found at trial were accepted without quarrel. Kaiser's contention on appeal was primarily a legal one, namely, that, when read properly, the claims and specification of the patent satisfied section 112. In Blonder-Tongue, the Supreme Court expressed special concern about patent litigation encrusted with rarified scientific concepts that have at times baffled judges untrained in the sciences.[92] But it appears that the questions presented to the Sixth Circuit involved essentially the meaning of reasonably non-technical language, and whether plain words in documents fulfilled the statutory mandate. Judges are uniquely well-qualified to resolve such questions.
 
 
 113
 On balance, the McLouth opinions are internally consistent, creditable analyses that appear compatible both with the language of the patent at issue and the principles of controlling law.
 
 
 114
 Other cases interpreting the Blonder-Tongue doctrine have required a most stringent standard for demonstrating failure of scientific comprehension.[93] In Blonder-Tongue on remand the district court responded to plaintiffs' argument that the initial trial court had not understood the technical issues by stating that, "It would demand arrogance so to conclude. . . . (The goals of Blonder-Tongue) cannot be achieved if mere disagreement in the second court supervenes the defense."[94] The Second Circuit has held that collateral estoppel will operate unless the first trial court has committed "an egregious error" involving a "blatant misunderstanding."[95]
 
 
 115
 Based on our consideration of McLouth, and without expressly endorsing the determination in McLouth, we hold that this case is not one of the rare exceptions enumerated in Blonder-Tongue where estoppel may be avoided because the courts in the earlier case did not fathom the process disclosed in the patent.
 
 
 116
 3. The Scope of Review.
 
 
 117
 It is necessary to comment on the scope of review undertaken by the Western District in reaching its conclusions. Such review should be confined to as narrow a scope as is consonant with assuring a full and fair opportunity to litigate in the prior case. A more probing review would be contrary to the purpose of the Blonder-Tongue rule. Unfortunately, no bright line emerges to distinguish between the review that Blonder-Tongue requires, and the unsparing scrutiny that would eviscerate the Blonder-Tongue doctrine.[96] Yet, guide posts have been erected.
 
 
 118
 District courts obliged to rule on Blonder-Tongue estoppel motions have, as we have here, reviewed certain pertinent data relating to the first trial for the general purpose of establishing that a full and fair opportunity to litigate was offered. They have considered, for example, whether the matter was tried, or whether it terminated by summary judgment, consent, or other settlement. Beyond examining the amplitude of the opinions, courts have also taken note of the length of trial, the pages of testimony, the number of witnesses and the exhibits.[97] A reading of the opinions, briefs, docket sheets, and other documents of record frequently suffices to resolve any doubts regarding a full opportunity to litigate.[98]
 
 
 119
 In Sampson v. Ampex Corp.,[99] in order to ascertain whether estoppel would be appropriate, the Second Circuit undertook a review of the voluminous record of the earlier trial. Judgment at the earlier trial had been adverse to the patentee, but because the parties had reached a settlement after trial no appeal had been prosecuted. The Second Circuit circumscribed its interest in the record most carefully, insisting that it did not re-assess the merits of the trial:
 
 
 120
 Rather, we have examined the merits in the (earlier) case only to satisfy ourselves that decision was not based on such a blatant misunderstanding of the relevant legal principles as to make application of the estoppel doctrine inequitable.[100]
 
 
 121
 The Supreme Court in Blonder-Tongue indicated that, where the opinions exhibit an utter lack of comprehension by the initial judges,[101] a patentee might secure a second trial of the patent's validity. While examination may legitimately encompass more than the face of the opinions, the Supreme Court strongly suggested that when a court is asked to investigate the competence of an earlier trial court, its function is strictly limited. In practice, subsequent courts have inspected the record to observe whether the first judge appeared to exhibit an understanding of the matter during the proceedings. It has been found helpful, although not indispensable, to search the record of the former case to substantiate or refute an argument relating to an estoppel defense. In Wahl v. Vibranetics, Inc., the Sixth Circuit examined the record of an earlier case to discover whether the first judge had understood the scientific basis of the patent.[102] It concluded that no failure to comprehend the subject matter was demonstrated because the record disclosed that the district court was "keenly aware" of the issues for decision and the contentions of the parties. The judge had participated, as Judge Freeman did in the Michigan case, in questioning witnesses; and he engaged in discussions with counsel regarding proposed findings of fact, revealing a working knowledge of the subject.
 
 
 122
 In determining whether the McLouth courts had the necessary scientific command of the basic oxygen process, the Western District Court conducted an extraordinary, wide-ranging scrutiny of the first trial. It concluded that in order to know whether the McLouth courts understood the basic oxygen process, it was necessary (a) to conduct independent evaluations of the experiments that the Michigan Court viewed;[103] (b) to reinterpret the testimony and the credibility of expert witnesses in McLouth;[104] (c) to resort to outside authorities for an understanding of the scientific information presented in McLouth;[105] (d) to weigh testimony; and (e) to interpret certain documentary evidence.[106]
 
 
 123
 Positions taken by counsel for plaintiffs in McLouth were reconstrued, and reasons were given to excuse binding the plaintiffs to the manner in which they conducted the trial.[107] Guided by hindsight, the Western District dissected the findings of the McLouth trial and reached its own conclusions because "the prior District Court found as best it could from the mass of evidence and exhibits, most of which could not be detailedly and fully examined, . . . while I on the other hand was not so hampered."[108]
 
 
 124
 Although Blonder-Tongue endorses a review of the prior trial by the district court judge in a subsequent case, it does not authorize unbridled excursions into the record of the earlier trial before applying the estoppel of the previous judgment. We have concluded that the Western District Court did not confine its inquiries to proper bounds, namely, whether the Michigan court displayed an understanding of the issues presented, adequately considered the evidence, and came to conclusions not altogether in disregard of the relevant technology, the evidence presented, and the governing principles of law. In deciding that the McLouth courts did not have an adequate command of the scientific subject, the Western District Court considered evidence not properly before it and delved impermissibly into the merits of the earlier case. Such procedure results in a substantial misallocation of judicial resources and undermines the very purposes of Blonder-Tongue.
 
 
 125
 H. Conclusion.
 
 
 126
 In fashioning the rule of Blonder-Tongue, Justice White for a unanimous Court made it clear that a determination of patent invalidity, after a thorough and equitable judicial inquiry, creates a collateral estoppel barrier to further litigation to enforce that patent. The Blonder-Tongue result advances the salutary goals of avoiding commercial intimidation based on patents that have once been declared invalid, and of conserving limited judicial resources. At the same time, fairness to litigants, both patentees and others, is preserved.
 
 
 127
 The case before us presents a situation quite akin to that in Blonder-Tongue. No exceptional circumstances have been suggested that would warrant a result here contrary to that reached in the Blonder-Tongue case. Indeed, arriving at such an adverse conclusion would, in effect, dismantle the beneficient effects of the Supreme Court rule.
 
 
 128
 Since the district court erred in its determination that the McLouth decision erected no collateral estoppel bar to the present litigation, we reverse its determination. An order will be entered directing the district court to grant judgment for the defendant based on collateral estoppel.
 
 
 
 [1]
 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971)
 
 
 [2]
 Henry J. Kaiser Co. v. McLouth Steel Corp., 257 F.Supp. 372 (E.D.Mich.1966), aff'd sub nom. Kaiser Industries Corp. v. McLouth Steel Corp., 400 F.2d 36 (6th Cir. 1968), cert. denied, 393 U.S. 1119, 89 S.Ct. 992, 22 L.Ed.2d 124 (1969) (hereafter McLouth)
 The entire transcript and record in McLouth, briefs from both parties in the district court and in the court of appeals, the appendices in the court of appeals, the opinions from the district court and court of appeals, and the papers requesting and opposing certiorari in the Supreme Court were included in the record of the District Court for the Western District of Pennsylvania to aid in its consideration of the collateral estoppel issue. Appendix Vol. II, 1091-92.
 
 
 [3]
 In deciding this case, the district court wrote three opinions, entitled Opinion Summary Collateral Estoppel (1-169); Opinion Compendium Collateral Estoppel (1-446); and Opinion The Jones & Laughlin Cases (1-127). The opinions are dated Jan. 29, 1974; each was amended Feb. 11, 1974; judgment was entered Feb. 19, 1974. References are to the typescripts, referred to respectively as Summary, Compendium, and Opinion
 
 
 [4]
 United States patent 2,800,631, issued July 23, 1957
 
 
 [5]
 Vereinigte Oesterreichische Eisen-Und Stahlwerke Aktiengesellschaft (VOEST)
 
 
 [6]
 Brassert Oxygen Technik, A.G. (BOT). A third partner, OAM, Oesterreichisch-Alpine Montangesellschaft, is not directly involved in the present dispute
 6a Jurisdiction is founded on 28 U.S.C. §§ 1332(a)(1), 2201, 2202, and 35 U.S.C. §§ 271, 281.
 
 
 [7]
 Instructive historical synopses of the steel making process may be found in the district court Compendium, 15-23, and in its Summary, 6-18. Also see McLouth, 257 F.Supp. at 377-80, 400 F.2d at 38-40
 
 
 [8]
 First there was the Bessemer-Thomas process, developed in the 1850's, in which air is blown through a series of inlets or tuyeres in the bottom of a vessel containing molten pig iron. The contaminants selectively react with the oxygen that is in the air, and the impurities rise to the surface, to form a slag layer, or to go off into the air as carbon monoxide or carbon dioxide. Several limitations made the Bessemer-Thomas process far from ideal: nitrogen from the air was not excluded from the final steel product; excessive quantities of phosphorous or sulphur might remain; and complications entailed in the process made it costly and inefficient. Bessemer-Thomas refining has virtually disappeared from modern steel making
 The open hearth process, initially employed in the 1880's, uses a large furnace fired by oil or gas as the locus of refining. The open hearth method produced high calibre steel. Its drawbacks were the need for large amounts of capital, high operating costs, a slow refining rate, and a relatively low production capacity per furnace. The open hearth process dominated in steel manufacturing before the advent of the basic oxygen process, accounting for approximately 90% of steel production in the United States in the 1950's.
 A third refining process, involving the electric furnace, is used very seldom for general commercial purposes because of its high production costs. See note 9, infra.
 
 
 [9]
 These undisputed facts and statistics on steel making processes are derived from evidence submitted below, from the Opinion of the Western District Court, 25-26 (whose data sources are the 1967 Minerals Year Book, Bureau of Mines, U.S. Dept. of Interior, and a report by the American Iron & Steel Institute), and from the district court opinion in McLouth, 257 F.Supp. at 378-79
 
 
 [10]
 German patent No. 735,196, issued July 3, 1943, granted to Schwarz' employer, H. A. Brassert & Co
 
 
 [11]
 Belgian patent No. 468,316, issued November 30, 1946; British patent No. 642,084, issued August 30, 1950; French patent No. 983,096, issued April 9, 1948
 
 
 [12]
 400 F.2d at 49: "Appellants (Kaiser et al.) have insisted throughout this case that they regard the subject matter of the patentees' invention to be 'avoidance of deep penetration.' " In their brief to the Sixth Circuit in McLouth, the same plaintiffs argued that the gist of the invention, avoidance of deep penetration, was the concept that the patentees intended to protect
 Plaintiffs have continued to acknowledge in the present case that avoidance of deep penetration by the oxygen jet is the critical nub of their invention. Plaintiffs' brief 8, 9, 13-14. See also, Suess continuation-in-part application, Nov. 1954, U.S. Patent Office; Drs. Hauttmann & Rinesch, affidavits, U.S. Patent Office.
 
 
 [13]
 In the course of this opinion, reference to Kaiser is intended to incorporate the other plaintiffs wherever appropriate
 
 
 [14]
 35 U.S.C. § 112 (1954) requires that a patent specification:
 contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same . . . .
 The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.
 
 
 [15]
 The Cuscoleca patent, U.S. No. 2,741,555, issued April 10, 1956, was also a basis for the Patent Office rejection of the continuation-in-part claims. Cuscoleca, also held by the plaintiffs, appears to have teachings quite similar to the Suess patent. Despite its having been filed subsequent to Suess, Cuscoleca issued earlier. Cuscoleca is not directly involved in the present litigation
 
 
 [16]
 Plaintiffs' Exhibit 2-A, Patent Office File Wrapper of Suess patent
 
 
 [17]
 Id
 
 
 [18]
 A more extended discussion of the proffered claims and their reception by the Patent Office may be found in McLouth, 400 F.2d at 52-55
 
 
 [19]
 See note 12, supra
 
 
 [20]
 The Suess patent has been the subject of litigation practically from its date of issue. In Kaiser Industries Corp. v. Wheeling-Pittsburgh Steel Corp., 328 F.Supp. 365 (D.Del.1971), reference is made to the existence of ten suits in addition to the McLouth and Jones & Laughlin cases involving the Suess patent. At oral argument it was stated, without objection, that a number of the cases have been consolidated and that further proceedings have been stayed pending the determination of this case. At oral argument it was also indicated that unpaid royalties and damages for infringement under the Suess patent exceed one billion dollars
 
 
 [21]
 Anticipation constitutes a patent defense under 35 U.S.C. § 102 (1954)
 
 
 [22]
 Obviousness constitutes a patent defense under 35 U.S.C. § 103 (1954)
 
 
 [23]
 Lack of inventorship constitutes a patent defense under 35 U.S.C. § 102(f) (1954)
 
 
 [24]
 257 F.Supp. at 377, note
 
 
 [25]
 Supra note 2
 
 
 [26]
 35 U.S.C. § 282 (1959). Trio Process Corp. v. L. Goldstein's Sons, Inc., 461 F.2d 66 (3d Cir.), cert. denied 409 U.S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262 (1972)
 
 
 [27]
 257 F.Supp. at 398
 
 
 [28]
 Id. at 399
 
 
 [29]
 Id. at 441-42. This Circuit adheres to the same rule of interpretation. Corning Glass Works, Inc. v. Anchor Hocking Glass Corp., 374 F.2d 473 (3d Cir. 1967), cert. denied 389 U.S. 826, 88 S.Ct. 65, 19 L.Ed.2d 80 (1967)
 
 
 [30]
 Id. 257 F.Supp. at 426 (reference omitted)
 
 
 [31]
 Id. at 426
 
 
 [32]
 Id
 
 
 [33]
 257 F.Supp. at 427, quoting Schriber-Schroth, 311 U.S. 211, 220, 61 S.Ct. 235, 85 L.Ed. 132 (1940), and relying on Smith v. Magic City Kennel Club, Inc., 282 U.S. 784, 51 S.Ct. 291, 75 L.Ed. 707 (1931) and Leggett v. Avery, 101 U.S. 256, 25 L.Ed. 865 (1879)
 
 
 [34]
 311 U.S. 211, 220-221, 61 S.Ct. 235, 239 (1940)
 
 
 [35]
 257 F.Supp. at 428. Schriber-Schroth Co. v. Cleveland Trust Co., 305 U.S. 47, 59 S.Ct. 8, 83 L.Ed. 34 (1938)
 
 
 [36]
 257 F.Supp. at 433
 
 
 [37]
 Id. at 439. For this proposition the Michigan court cited cases including United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, 63 S.Ct. 165, 87 L.Ed. 232 (1942); Huntman Stabilizer Corp. v. General Motors Corp., 144 F.2d 963 (3d Cir. 1944)
 
 
 [38]
 A cross-appeal was taken by McLouth on the issues of obviousness and inventorship
 
 
 [39]
 Kaiser, Brief on appeal to the Sixth Circuit in McLouth at 26
 
 
 [40]
 400 F.2d 36, 38 (6th Cir. 1968)
 
 
 [41]
 United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, 63 S.Ct. 165, 87 L.Ed. 232 (1942). See infra note 88
 
 
 [42]
 400 F.2d at 54
 
 
 [43]
 Grave doubts were raised by the Sixth Circuit regarding the correctness of the district court's holding that the invention was not obvious. However, the case was not remanded for further findings on this point because of the ultimate holding of invalidity on other grounds
 
 
 [44]
 311 U.S. at 220, 61 S.Ct. 235; Smith v. Magic City Kennel Club, Inc., 282 U.S. 784, 51 S.Ct. 291, 75 L.Ed. 707 (1931); Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 62 S.Ct. 513, 86 L.Ed. 736 (1942)
 
 
 [45]
 400 F.2d at 54
 
 
 [46]
 Id. at 55
 
 
 [47]
 393 U.S. 1119, 89 S.Ct. 992, 22 L.Ed.2d 124 (1969). In the petition for certiorari, Kaiser did not contend that it was foreclosed from an adequate opportunity to present evidence on the file wrapper estoppel point. Rather, it claimed the Sixth Circuit had erred as a matter of law as to the file wrapper estoppel
 
 
 [48]
 This motion was presented to the court below eighteen months after trial had concluded, some three years after the district court decision in McLouth, over a year after the Sixth Circuit affirmance, and six months after the denial of certiorari in that case. The suggested reason for reopening the record was to fill an alleged "void" in the record of McLouth, see text at n. 45, supra, since Kaiser wished to combat the inference of abandonment of its original claim language. The Western District Court noted, however, that it disputed the existence of such a void. Summary 120. Compendium 403
 
 
 [49]
 As the Western District Court observed, it is somewhat difficult to perceive in what way the final claim language, "avoid material agitation," is more positive than the cancelled language, "avoid deep penetration." Compendium 66-67
 
 
 [50]
 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971)
 
 
 [51]
 See note 3 supra
 
 
 [52]
 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). The mutuality doctrine had long been criticized; both state courts and lower federal courts had eliminated mutuality as a requisite for collateral estoppel in many nonpatent areas of law. E. g., Bruszewski v. United States, 181 F.2d 419 (3d Cir. 1950), cert. denied, 340 U.S. 865, 71 S.Ct. 87, 95 L.Ed. 632 (1950); Zdanok v. Glidden Co., 327 F.2d 944 (2d Cir. 1964), cert. denied 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964); Bernhard v. Bank of America, 19 Cal.2d 807, 122 P.2d 892 (1942)
 
 
 [53]
 297 U.S. 638, 56 S.Ct. 645, 80 L.Ed. 949 (1936). An early case establishing the basic elements of collateral estoppel, that included mutuality, is Cromwell v. County of Sac, 94 U.S. 351, 24 L.Ed. 195 (1876)
 
 
 [54]
 Bigelow v. Old Dominion Copper Mining & Smelting Co., 225 U.S. 111, 127, 32 S.Ct. 641, 56 L.Ed. 1009 (1912), quoted in Blonder-Tongue, 402 U.S. at 321, 91 S.Ct. (1434) at 1439, 28 L.Ed.2d 788
 
 
 [55]
 A prior ruling could not ordinarily be asserted against a non-party, consistent with current understanding of due process. E. g., Philips Electronic & Pharm. Ind. v. Thermal & Electronics Ind., 450 F.2d 1164 (3d Cir. 1971) (patentee cannot assert Blonder-Tongue estoppel where first adjudication results in finding of validity)
 Critics have admonished the courts lest the collateral estoppel doctrine be expanded improvidently. Due process considerations must, they argue, prevail over the interests of judicial economy. See Semmel, Collateral Estoppel, Mutuality and Joinder of Parties, 68 Colum.L.Rev. 1457 (1968); Currie, Civil Procedures: The Tempest Brews, 53 Calif.L.Rev. 25 (1965); Moore & Currie, Mutuality and Conclusiveness of Judgments, 35 Tul.L.Rev. 301 (1961).
 
 
 [56]
 University of Illinois Foundation v. Winegard Co., 271 F.Supp. 412 (S.D.Iowa 1967), aff'd 402 F.2d 125 (8th Cir. 1968), cert. denied 394 U.S. 917, 89 S.Ct. 1191, 22 L.Ed.2d 452 (1969)
 
 
 [57]
 402 U.S. at 332, 91 S.Ct. at 1444
 
 
 [58]
 402 U.S. at 333, 91 S.Ct. at 1445, quoting Eisel v. Columbia Packing Co., 181 F.Supp. 298, 301 (D.Mass.1960)
 
 
 [59]
 Blumcraft v. Kawneer Co., 482 F.2d 542 (5th Cir. 1973); Sampson v. Ampex Corp., 478 F.2d 339 (2d Cir. 1973); University of Illinois Found'n v. Blonder-Tongue Lab., Inc., 465 F.2d 380 (7th Cir. 1972), aff'g 334 F.Supp. 47 (N.D.Ill.). There is not unanimity on this matter, however. See 49 N.Y.U.L.Rev. 343 (1974)
 
 
 [60]
 402 U.S. at 333-34, 91 S.Ct. 1434 (citations omitted)
 
 
 [61]
 402 U.S. at 333, 91 S.Ct. at 1445
 
 
 [62]
 See Blumcraft v. Kawneer Co., 482 F.2d 542 (5th Cir. 1973)
 
 
 [63]
 In Hall v. United States Fiber & Plastics Corp., 476 F.2d 418 (3d Cir. 1973), the district court had held that the patent was invalid and that the defendant had not infringed. An appeal was taken only on the question of validity, which the patentee claimed could be asserted against him subsequently under Blonder-Tongue. The Court dismissed the appeal as moot and held that the estoppel effect was a matter to be addressed in a later suit, citing Rest. Judgments, § 69(2) to the effect that foreclosure from appeal by reason of mootness deprives a judgment of its conclusive effect. But see Sampson v. Ampex Corp., 478 F.2d 339 (2d Cir. 1973) (estoppel granted although appeal not pursued)
 
 
 [64]
 But see Carter-Wallace, Inc. v. United States, 496 F.2d 535 (Ct.Cl.1974), according estoppel effect against a patentee, based on Carter-Wallace, Inc. v. Otte, 474 F.2d 529 (2d Cir. 1972), cert. denied 412 U.S. 929, 93 S.Ct. 2753, 37 L.Ed.2d 156 (1973)
 In Otte, because the defendant was trustee in a bankruptcy reorganization of the alleged infringer, it had no resources to present a full defense. Consequently, the defendant's case was presented by incorporation of testimony from a trial by the patentee against a different defendant.
 
 
 [65]
 Blumcraft v. Kawneer Co., 482 F.2d 542 (5th Cir. 1973) (patent invalid under Blonder-Tongue ); Blumcraft v. Architectural Art Mfg. Co., 337 F.Supp. 853 (D.Kan.) aff'd 459 F.2d 482 (10th Cir. 1972) (patent invalid under Blonder-Tongue ); Blumcraft v. United States, 372 F.2d 1014 (Ct.Cl.1967) (patent valid); Blumcraft v. Citizens & Southern Ntl. Bank, 407 F.2d 557 (4th Cir.), cert. denied 395 U.S. 961, 89 S.Ct. 2103, 23 L.Ed.2d 747 (1969) (patent invalid)
 
 
 [66]
 The isolated exception that has come to our attention, permitting relitigation of the issue of patent validity, is Grantham v. McGraw-Edison Co., 444 F.2d 210 (7th Cir. 1971). That case, decided within a week of Blonder-Tongue, presented a number of exceptional factors, including a change in patent ownership and a truncated earlier trial. See also, Berner v. British Cmwlth. Pacific Airlines, Ltd., 346 F.2d 532 (2d Cir. 1965), cert. denied, 382 U.S. 983, 86 S.Ct. 559, 15 L.Ed.2d 472 (1966) (non-patent; a multi-victim accident litigation)
 
 
 [67]
 Summary 168
 
 
 [68]
 402 U.S. at 343-46, 91 S.Ct. 1434 and cases cited therein
 
 
 [69]
 181 F.2d 419 (3d Cir.), cert. denied, 340 U.S. 865, 71 S.Ct. 87, 95 L.Ed. 632 (1950). In a protest against the Triplett doctrine in the patent field, Judge Hastie dissented in Nickerson v. Kutschera, 419 F.2d 983, 984 (3d Cir. 1969), on grounds of collateral estoppel
 
 
 [70]
 Lynne Carol Fashions, Inc. v. Cranston Print Works Co., 453 F.2d 1177, 1181 (3d Cir. 1972)
 
 
 [71]
 Bruszewski v. United States, 181 F.2d at 421. Lynne Carol Fashions, supra note 70; Provident Tradesmens Bank & Trust Co. v. Lumbermens Mutual Casualty Co., 411 F.2d 88 (3d Cir. 1969); Scooper Dooper, Inc. v. Kraftco Corp., 494 F.2d 840 (3d Cir. 1974). Possible affirmative use of collateral estoppel against a losing defendant, a concept not at issue here, was suggested by the Court en banc in Katz v. Carte Blanche Corp., 496 F.2d 747 (3d Cir. 1974), cert. denied 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (Oct. 15, 1974)
 
 
 [72]
 Opinion Summary 168
 
 
 [73]
 The Sixth Circuit discussion is in 400 F.2d, supra, at 49-53
 
 
 [74]
 Kaiser argues that where a decision is premised on more than one ground, neither ground carries any collateral estoppel effect. In support, Kaiser refers to Halpern v. Schwartz, 426 F.2d 102 (2d Cir. 1970). In Halpern, an earlier case had voided a transfer in bankruptcy, based on three independent grounds. One ground was that the transfer was "intentional." One of the parties attempted to assert the collateral estoppel effect of the finding that the transfer was intentional. The Second Circuit declined to permit this effort, ruling that the isolated word formed but a part of one of three separate grounds of decision. The court reasoned that it would be improper to assume that "intentional" was used with the requisite consideration for collateral estoppel to apply
 By contrast, in the case here, all the grounds of the very core of the first decision, that is, the invalidity of the Suess patent, are urged for collateral estoppel purposes, and it is beyond question that the entire McLouth determination was accompanied by a carefully considered and plenary review. No suggestion was made in Blonder-Tongue that a holding of patent invalidity predicated on several grounds was entitled to less collateral estoppel weight than a patent held invalid for but one reason.
 
 
 [75]
 See, for example, the Western District Court's consideration of the McLouth discussion of "Onto and below the surface" at Summary 46-47 and Compendium 175-187, and its analysis of the McLouth result regarding "Material agitation" at Summary 48-55 and Compendium 188-212
 
 
 [76]
 402 U.S. at 333, 91 S.Ct. at 1445
 
 
 [77]
 Summary 148
 
 
 [78]
 Summary 148-154; Compendium 67-68
 
 
 [79]
 Summary 113, 136
 
 
 [80]
 It is not the case that the Michigan District Court raised the file wrapper estoppel issue for the first time in its opinion. Earlier, at final trial argument in McLouth, the Michigan District Court specifically confronted the Kaiser attorney with the possibility of a file wrapper estoppel. The response was a brief denial by Kaiser's counsel of the applicability of the doctrine to the pending case. No request was made at that time by Kaiser to reopen the record for submission of evidence or briefs
 
 
 [81]
 Jones & Laughlin contends that the proper application of the file wrapper estoppel doctrine permits consideration only of the written documents in the Patent Office file. It urges that no testimony may properly be adduced regarding the contents of discussions between the patent examiner and the patentee. A close reading of the Sixth Circuit opinion, quoted supra at n. 45, 400 F.2d at 54, may substantiate this theory. The Sixth Circuit noted a "void" in the McLouth trial record respecting the reasons for the eleventh hour substitution of claim language. However, this lack was apparently not critical to the Sixth Circuit, which inferred abandonment because earlier claims of "avoid deep penetration" had been rejected under prior art. Because we determine that collateral estoppel precludes further litigation on the file wrapper question, the scope of inquiry in file wrapper estoppel disputes is not an issue the Court must address
 
 
 [82]
 Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 205, 61 S.Ct. 235, 185 L.Ed. 132 (1940); Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 62 S.Ct. 513, 86 L.Ed. 736 (1942); Smith v. Magic City Kennel Club, Inc., 282 U.S. 784, 51 S.Ct. 291, 75 L.Ed. 707 (1931). See Trio Process Corp. v. L. Goldstein's Sons, Inc., 461 F.2d 66 (3d Cir.), cert. denied, 409 U.S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262 (1972)
 
 
 [83]
 This Court expresses no views on the correctness of the holdings in McLouth either by the district or appeals court pertaining to the file wrapper estoppel issue. See note 59, supra
 83a See notes 88-93, infra, and accompanying text.
 
 
 [84]
 Kaiser, Brief to Sixth Circuit in McLouth, 26
 
 
 [85]
 Compendium 61-62
 
 
 [86]
 See supra 27-28. It is not significant that the earlier holding of invalidity preceded the Blonder-Tongue decision. Blonder-Tongue on remand, 334 F.Supp. 47 (N.D.Ill.1971), aff'd 465 F.2d 380 (7th Cir. 1972), cert. denied 409 U.S. 1061, 93 S.Ct. 559, 34 L.Ed.2d 513 (1972). Technograph family, infra note 96; Blumcraft family, supra note 65
 
 
 [87]
 The Supreme Court indicated that the record in Blonder-Tongue might be supplemented on remand "with any evidence showing why an estoppel should not be imposed in this case." 402 U.S. at 350, 91 S.Ct. at 1454. Under such a directive, the only evidence that could appropriately be admitted in this case would be information bearing on Kaiser's decision not to appeal to the Sixth Circuit the manner in which the Michigan court raised the file wrapper issue
 
 
 [88]
 See, e. g., the following cases cited by the Sixth Circuit: Halliburton Oil Well Cementing Co. v. Walker, 329 U.S. 1, 13, 67 S.Ct. 6, 12, 91 L.Ed. 3 (1946) ("a patentee cannot obtain greater coverage by failing to describe (its) invention than by describing it as the statute commands"); United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, 63 S.Ct. 165, 87 L.Ed. 232 (1942) (indefinite claims do not give notice of the invention that is required by Congress); Thabet Mfg. Co. v. Kool Vent Metal Awning Corp., 226 F.2d 207 (6th Cir. 1955) (patentee is bound by definition of phrase suggested to, and accepted by, the Patent Office)
 The following additional cases were cited by the Michigan District Court: General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 522 (1938) (the claims measure the invention; they must inform the public of the limits of the invention); Schriber-Schroth Co. v. Cleveland Trust Co., 305 U.S. 47, 59 S.Ct. 8, 83 L.Ed. 34 (1938) (claims cannot claim more than the specification discloses).
 
 
 [89]
 See Wahl v. Vibranetics, 474 F.2d 971 (6th Cir. 1973), where the Court of Appeals affirmed a grant of summary judgment for defendants based on collateral estoppel over protests that the earlier trial court had misunderstood the case and that crucial evidence was unavailable at the first trial. See also cases cited in notes 65, 96
 
 
 [90]
 Id. at 975
 
 
 [91]
 See, e. g., 257 F.Supp. at 387, 394-95, 405, 425, 430, 433, 439
 
 
 [92]
 402 U.S. 331-32, 91 S.Ct. 1434 and cases cited therein
 
 
 [93]
 No case has come to our attention holding that estoppel was inappropriate because of a failure of comprehension in the first trial
 
 
 [94]
 334 F.Supp. 47, 50 (N.D.Ill.1971), aff'd per curiam 465 F.2d 381 (7th Cir.), cert. denied 409 U.S. 1061, 93 S.Ct. 559, 34 L.Ed.2d 513 (1972)
 
 
 [95]
 Sampson v. Ampex Corp., 478 F.2d 339 (2d Cir. 1973)
 
 
 [96]
 For a discussion of this problem, see Smith, The Collateral Estoppel Effect of a Prior Judgment of Patent Invalidity: Blonder-Tongue Revisited, 55 J.P.O.S. 285, 363, 436 (1973)
 
 
 [97]
 Blumcraft family of cases, supra note 65. Technograph Printed Circuit cases, all predicating estoppel on Technograph Printed Circuit, Ltd. (TPC) v. Bendix Aviation Corp., 218 F.Supp. 1 (D.Md.1963), aff'd per curiam, 327 F.2d 497 (4th Cir. 1964), cert. denied 379 U.S. 826, 85 S.Ct. 53, 13 L.Ed.2d 36 (1964); TPC v. United States, 484 F.2d 1383, 202 Ct.Cl. 867 (1973); TPC v. Methode Electronics, Inc., 484 F.2d 905 (7th Cir. 1973); TPC v. Martin-Marietta Corp., 474 F.2d 798 (4th Cir. 1973)
 See also the factors discussed in United States v. Air Lines, Inc., 216 F.Supp. 709, 725-30 (E.D.Wash.1962), aff'd sub nom. United Air Lines, Inc. v. Wiener, 335 F.2d 379, 404-05 (9th Cir. 1963), cert. dismissed, 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549 (negligence case).
 
 
 [98]
 Where a particular claim of deprivation of crucial evidence is raised, some analysis of the record to garner the relevant procedural facts may be required
 
 
 [99]
 478 F.2d 339 (2d Cir. 1973)
 
 
 [100]
 Id. at 342-43
 
 
 [101]
 402 U.S. at 333, 91 S.Ct. 1434
 
 
 [102]
 474 F.2d 971 (6th Cir. 1973). Technograph Printed Circuits, Ltd. v. Martin-Marietta Corp., 474 F.2d 798 (4th Cir. 1973)
 
 
 [103]
 E. g., Summary 59-63, 95, 154. Compendium 15
 
 
 [104]
 E. g., Summary 67-80, 92, 95, 154
 
 
 [105]
 E. g., Summary 78-79. Compendium 12, 201-02
 
 
 [106]
 E. g., Summary 153
 
 
 [107]
 E. g., Summary 91; 92 ("I, by hindsight, now realize that counsel for the plaintiffs might have pointed to much in the specifications for answers to the district court's questioning. . . . "); 94, 95-96 (" . . . plaintiffs' counsel . . . put on a 'selling campaign' to the district court of 'reduced impact pressure of the jet on the bath so as to avoid deep penetration' and . . . he in very great likelihood oversold the feature at the trial"); 162 ("I considered the submissively respectful attitude of plaintiff's counsel . . . " and "plaintiff's counsel said the gist or the primary difference between the prior art process and (Suess) was that 'you avoid deep penetration' "); 163 ("overemphasis (by counsel) is a common fault")
 
 
 [108]
 Summary 79. Compendium 14-15