**RANSBURG ELECTRO–COATING CORP., Appellee,**

v.

**IONIC ELECTROSTATIC CORPORATION, Appellant.**

**No. 10347.**

United States Court of Appeals Fourth Circuit.

Argued May 5, 1966.

Decided April 11, 1968.

Edward F. Levy, New York City (John S. McDaniel, Jr., Lawrence A. Kaufman, and Cable & McDaniel, Baltimore, Md., on the brief) for appellant.

James P. Hume, Chicago, Ill., Howard W. Clement, Chicago, Ill., Verne A. Trask, Indianapolis, Ind., and Anderson, Coe & King, Baltimore, Md., on the brief for appellee.

Before HAYNSWORTH, Chief Judge, and BOREMAN and J. SPENCER BELL,* Circuit Judges.

---

HAYNSWORTH, Chief Judge:

The defendant has appealed from an order holding it in contempt of an injunctive order entered in a patent case. The contempt finding is premised upon a finding that certain devices for use in electrostatic spray painting systems are the equivalent of certain other devices previously found to infringe the plaintiff's patents and that the sale and use of the new devices were proscribed by the terms of the injunction. In light of the prior art, which the patentee has no right to appropriate, we think the finding erroneous.

Plaintiff's patents cover paint feeding mechanisms in which paint is delivered to atomizing heads connected with one terminal of a high voltage source on the order of 90,000 volts, creating an electrostatic field between the head and the grounded objects to be painted. The electrostatic forces atomize the paint into small droplets, each highly charged with negative ions, and the electrostatic field deposits them on the work. The defendant's devices with which we are now concerned have insulated or nonconductive heads unconnected to any power source. Rotated at speeds up to 21,000 r.p.m., atomization of the paint is essentially centrifugal, but the head itself is within an electrostatic field created by a discharging electrode electrically connected to a high voltage source from which the uncharged head acquires a static charge equal to that of any other object within the electrostatic field along the same line of force. Whether the plaintiff's patent and the injunction against its infringement can reach the defendant's devices in which the atomizing head is not the discharging electrode is the essential question.

Some reference to the prior art is essential to an understanding of the problem.

Spray painting has long been known. Compressed air has long been used for

* Judge J. Spencer Bell participated in the hearing of this case and expressed general approval of the result, but died before the opinion was prepared.

breaking paint into fine droplets, known in the trade as "atomizing," on the same principle as employed in ladies' perfume bottles, insecticide spray cans and a multitude of household and industrial devices. Air spray guns are still used for a multitude of purposes, including very fine finishing, though airless guns have been developed with nozzles which achieve atomization of paint delivered under pressure for use in such finishing.[1]

Outside of the fine furniture field, however, the use of air spray guns for most industrial painting was wasteful of material, particularly when the objects to be painted were a succession of objects moving along a production line. There were other obvious disadvantages, for there was not only a waste of paint, but a collection of unwanted paint on other objects within the range of the sprayer.

This led to the introduction of electrostatic fields by connecting a discharging electrode to one side of a high voltage source and connecting the other side to the work to be painted or to the ground, in which event the work to be painted was grounded. Paint atomized in an air spray or centrifugally when introduced into such an electrostatic field picked up static charges from the field, which tended to make particles repel each other while each was being attracted to the work. This system was referred to for convenience as "Ransburg No. 1," for the plaintiff has long been prominent in this area and holds a number of expired patents upon variants of the general prior art system.

For the uses for which we are now concerned, the Ransburg No. 1 system was a substantial improvement over the use of spray guns without the assistance of the electrostatic field. It greatly reduced the waste of paint and its deposition upon unwanted material, but it did not entirely eliminate it. Some particles of paint acquired such great velocities that the forces in the electrostatic field were of insufficient strength to control their movement.

Ransburg then developed its No. 2 system represented by the patents in suit.[2] Under this system paint is fed at a controlled rate to a stationary head or one revolving at a relatively low speed for the sole purpose of delivering the paint in a film to the edge of the rotating head. The head itself is directly connected to the negative terminal of a high voltage source, however, which makes the head the discharging electrode. There is thus created an electrostatic field between the head, as the discharging electrode, and the work which, with 90,000 volts, is itself effective to break up the paint into fine particles and move the particles through the electrostatic field and deposit them on the work. The field is quite comparable to an electromagnetic field, which we have all observed with the use of iron filings, and is quite effective to deposit paint on all sides of such objects as broom handles.

The Ransburg No. 2 system is quite effective in overcoming the disadvantages of the No. 1 system. Waste is completely eliminated, or almost completely so, and the particles of the paint are finer and much more uniform than in the previous system as practiced before Ransburg No. 2 was developed. This was because no other forces than the electrostatic field were acting upon the particles to give them velocity and because the initial negative charge of each particle was substantially the same as that delivered directly to the discharging head by the power source. Inventiveness was said to lie essentially in use of the head as the discharging electrode and in the concept of achieving atomization by electrostatic forces rather than by the mechanical forces theretofore employed.

With general success, Ransburg asserted its patents on the No. 2 system against

1. See Gray Co. v. Spee-Flo Mfg. Corp., 5 Cir., 361 F.2d 489.

2. There are separate patents representing different forms of discharging heads, but for our present purposes they all incorporate and exemplify the same principle.

copyists defending on the ground of patent invalidity because of obviousness and non-infringement because in the accused devices atomization of the paint was achieved by a combination of mechanical and electrostatic forces.[3] These were the original questions in this action, for the defendant had marketed spray guns with a spray head connected directly to a high voltage source, but rotating at speeds in the order of 900 r.p.m. so that atomization of the paint was the product of mechanical, as well as electrostatic forces. The District Court found the patents valid, and applied to them the "broad," not the "narrow"[4] construction to find infringement as long as the electrostatic forces played a substantial, though not an exclusive, part in the atomization of the paint.[5] We affirmed on the opinion of the District Court,[6] and that seems to be the consensus,[7] for Ransburg's patents are entitled to a sufficiently broad construction that they may not be practiced by the introduction of contributory forces which do not remove dependence upon the electrostatic forces for the atomization of the paint. It was found to have been quite enough if atomization of the paint had been accomplished through the teachings of the patent, though other available means to that end were also employed.

Appropriately, an injunction was issued against further infringement by Ionic. Meanwhile, however, Ionic had brought out three new models in which there is no direct connection between the atomizing head and the power source and in which, it is contended, electrostatic forces play no part in the atomization of the paint.

Because of these new models, of which Ransburg had general information, the defendant, Ionic, insisted that the injunctive decree be phrased in terms of the court's exposition of the essence of the invention, rather than by general reference to the patent. Consequently, the debate in the District Court on the contempt proceeding and here has been framed principally in terms of the injunctive order, without regard to the availability of the prior art to any practitioner.

The District Court found, within the terms of the injunctive order, that the presently accused devices achieve atomization of the paint, at least in part, electrostatically, that there is an electrostatic field between the atomizing head and the work sufficient to disperse and deposit the paint and that atomization is achieved at the point of highest concentration of forces in the electrostatic field.[8]

While we need not examine these findings *seriatim*, some comments are not inappropriate.

From high speed photographs, there was uncontroverted evidence that there was no discernible difference in the atomization of the paint with the field on and off. It was all mechanical. The plaintiff contended, however, that a test showed that if Ionic's heads were slowed from their extraordinarily high rotational speeds to zero and the feeding of the paint was stopped, there was evidence of the force of the electrostatic field. Of course there was. This was a natural phenomenon, long observed, and employed in this industry to remove excess paint. Known as "detearing," it had been long employed to draw off excessive

3. Ransburg Electro-Coating Corp. v. Proctor Electric Co., 4 Cir., 317 F.2d 302; Binks Mfg. Co. v. Ransburg Electro-Coating Corp., 7 Cir., 281 F.2d 252; Ransburg Electro-Coating Corp. v. Williams, W.D.Ark., 246 F.Supp. 626; Ransburg Electro-Coating Corp. v. Ford Motor Co., S.D.Ind., 245 F.Supp. 308.

4. See Ransburg v. Aerostyle Ltd., [1968] — A.C. —.

5. Ransburg Electro-Coating Corp. v. Proctor Electric Co., D.Md., 203 F.Supp. 235.

6. Ransburg Electro-Coating Corp. v. Proctor Electric Co., 4 Cir., 317 F.2d 302.

7. See cases cited in notes 3 and 4.

8. Ransburg Electro-Coating Corp. v. Proctor Electric Co., D.Md., 242 F.Supp. 28.

paint from objects to be coated. This application of the detearing principle when the accused device was stationary and with no paint feeding to it, proves little.

The plaintiff also offered evidence through strip tests that, while the particles into which the paint was atomized by Ionic's centrifugal guns were more than acceptably small and uniform with the electrostatic field off, they were still smaller with the electrostatic field on. It was contended that these strip tests showed that electrostatic forces played some part in the atomization of the paint and that it was not achieved exclusively by the centrifugal forces. The contention gives no weight to the fact that the uncharged atomized particles would tend to conglomerate, while in the presence of an electrostatic field each would tend to repel each other particle.

In the accused devices there is no doubt that the atomizing head is not the discharging electrode. The electrode is a separate grid or ring from which the atomizing head is insulated, and the head, usually, is of non-conductive material. Nevertheless, because the insulated or non-conductive head is within the electrostatic field created by the separate electrode, the head itself acquires a static charge equal to that of every other object within the electrostatic field along the same gradient. The static charge on the head is substantially less than the active charge on the electrode, but there is still a substantially high voltage varying between approximately 14,500 volts on the Model 10 to 32,000 volts on the Model 25.

The presence of this floating, static charge on the head is the basis for contentions by the plaintiff that there is an appreciable, separate electrostatic field between the head and the work and that atomization of the paint occurs at the point of greatest concentration of the electrostatic forces in that field. The plaintiff undertook to support the contention on the basis of an experiment conducted while the head was grounded. It is said that the grounding of the head eliminated the electrostatic field between the head and the work, leaving unaffected the electrostatic field between the electrode and the work. The contention, however, is entirely spurious. The head was neutral when insulated or non-conductive and uncharged. Grounding it made it a positive electrode of the same polarity as the work and with the same positive attraction for the particles of paint as the work. The inability of the system to deliver paint effectively with the head thus grounded and made a positive electrode is not suprising, but it lends no support whatever to the plaintiff's contention.

It is clear that the only active discharging electrode is the separate electrode connected to one side of the power source. It is the sole source of the negative ions effectively charging the particles of paint and moving them toward the work. While the head is the recipient of such ions by bombardment from the electrode just as the particles of paint are, it supplies none of itself.

If then the field be viewed as the one field existing between the two active electrodes, there is no separate field between the head and the work, and atomization of the paint does not occur at the point of greatest concentration of the electrostatic forces, which is at the discharging electrode.

Regardless of the answers to all of these questions arising out of an interpretation of the language of the injunction, consideration must be given to the prior art for it was never intended, of course, that the injunction should prohibit its practice.

In one of the plaintiff's expired, prior art patents in the No. 1 process,[9] it is recited that sometimes the spray gun itself is charged and made the active electrode. Even if the spray gun was uncharged, that and other Ransburg pat-

9. Pugh Patent No. 1,855,869 (1928).

ents [10] show that the ungrounded head was sometimes in the electrostatic field, and when it was there it received a floating static charge precisely as do the heads of Ionic's devices. The system of this prior art was thought not to invalidate Ransburg's patents on the No. 2 system for, even though the spray gun was directly connected to the power source or received a static, floating charge from the active electrode, atomization of the paint was essentially mechanical and not electrostatic. Nevertheless, it seems perfectly plain that electrostatic forces were present and operating to at least an equal extent and to an equal degree as they are present and operating in Ionic's devices. Ionic is entitled to practice that prior art system, and if the electrostatic forces play any part in its atomization of the paint, it differs neither in kind nor in degree from the part played by those same forces in the prior art systems.

We then come to the conclusion that infringement of Ransburg's patents on the No. 2 system is not avoided by partial dependence upon some other means to achieve atomization of the paint as long as there is substantial dependence upon electrostatic forces within the teaching of the patents, as the District Court initially held and we approved. There is no infringement, however, when dependence upon the electrostatic forces to atomize the paint is so insubstantial and minimal that it does not exceed the employment of those same forces in the prior art systems.

It follows that Ransburg did not sustain the heavy .burden placed upon it[11] of showing that Ionic was in contempt of the court and in violation of its decree by producing and marketing the presently accused devices.

Subsequent to the hearing of this appeal, a motion was made before a panel consisting of Judge Sobeloff, Judge Bryan and the writer that the case be remanded in general to the District. Court for reopening and consideration of a Russian patent and articles which were said to have come to light only recently and which Ionic contends completely anticipate and invalidate the Ransburg patents on its No. 2 system. In light of our disposition of the appeal, this motion may be academic, but the remand will be with leave to the District Court to consider any such application that may be made to it and to reopen its prior judgment, notwithstanding our previous affirmance of it, and to enter any modifying or substitute order which may seem appropriate.

I am authorized by Judges Sobeloff and Bryan to express their approval of this disposition of the motion.

Reversed and remanded.

---

10. Ransburg Patent No. 2,334,648 (1939); Helmuth Patent No. 2,421,787 (1945); Ransburg Patent No. 2,509,277 (1945).

11. General Electric Co. v. Wabash Appliance Corp., E.D.N.Y., 29 F.Supp. 1003.