RANSBURG CORPORATION, Plaintiff,

v.

AUTOMATIC FINISHING SYSTEMS, INC., Defendant.

Civ. A. No. 68–1320.

United States District Court, E. D. Pennsylvania, Civil Division.

March 31, 1976.

Robert L. Harmon, Clyde F. Willian, Chicago, Ill., Robert J. Zinn, John T. Synnestvedt, Philadelphia, Pa., for plaintiff.

Edward Lovett Jackson, Joseph Gray Jackson, Eugene Chovanes, Bala Cynwyd, Pa., for defendant.

## OPINION

DITTER, District Judge.

In this patent matter, the present question is whether the manufacturer of an allegedly infringing device so controlled the litigation of a prior suit involving identical

patents as to be bound in this case by the decision in that one.[1] Pursuant to Rule 52(a), Federal Rules of Civil Procedure, I make the following:

## FINDINGS OF FACT

1. Plaintiff, Ransburg Corporation[2] ("Ransburg") is an Indiana corporation with its principal office in Indianapolis.

2. Ransburg's business primarily involves methods and equipment for electrostatic spray coating, the foremost of which, Ransburg No. 2 Process, is the subject of the patents in this suit.[3]

3. In each of the following decisions some or all of the claims of some or all of the patents here in suit were adjudged valid and infringed: *Binks Manufacturing Company v. Ransburg Electro-Coating Corp.*, 281 F.2d 252 (7th Cir. 1960), cert. dismissed, 366 U.S. 211, 81 S.Ct. 1091, 6 L.Ed.2d 239 (1961); *Ransburg Electro-Coating Corp. v. Proctor Electric Co.*, 317 F.2d 302 (4th Cir. 1963);[4] *Ransburg Electro-Coating Corp. v. Standard Container Co.*, 167 U.S.P.Q. 426 (M.D.Ga.1970); *Ransburg Electro-Coating Corp. v. Williams*, 246 F.Supp. 626 (W.D. Ark.1965); and *Ransburg Electro-Coating v. Ford Motor Co.*, 245 F.Supp. 308 (S.D.Ind. 1965).

4. In *Ransburg Electro-Coating Corp. v. Ionic Electrostatic Corp.*, 395 F.2d 92 (4th Cir. 1968), it was held that the defendant, which had been enjoined from infringing plaintiff's patents on electrostatic spray painting systems, was not guilty of contempt in producing and marketing devices in which the dependence upon electrostatic forces to atomize paint was so insubstantial and minimal that it did not exceed employment of those forces under the prior state of the art.

5. Defendant, Automatic Finishing Systems, Inc. ("AFS"), is a New Jersey corporation with its principal place of business in Cinnaminson, New Jersey.

6. AFS manufactured and sold certain equipment and equipment components to Lansdale Finishers, Inc. ("Lansdale"), the Standard Container Company ("Standard"), and other businesses. AFS installed such equipment at Lansdale's plant in Lansdale, Pennsylvania, at Standard's plants in New Jersey and Georgia, and elsewhere.

7. In 1967, Ransburg brought suit against Standard in the United States District Court for the Middle District of Georgia for infringement of Ransburg's patents by reason of Standard's use of an AFS electrostatic spray coating system. See *Ransburg v. Standard Container Co.*, supra.

8. The *Standard* case was tried in October, 1969. On March 27, 1970, the court entered its Findings of Fact and Conclusions of Law and on April 20, 1970, granted an Interlocutory Judgment holding the Ransburg No. 2 Process patents, the same patents at issue in this suit, valid and en-

1. Plaintiff, Ransburg Corporation, instituted this action against both the manufacturer and purchaser of an allegedly infringing device. This court's award of summary judgment for the plaintiff was reversed by the Court of Appeals. See *Ransburg Electro-Coating Corp. v. Lansdale Finishers, Inc.*, 345 F.Supp. 299, 174 U.S.P.Q. 407 (E.D.Pa.1972), reversed and remanded, 484 F.2d 1037, 179 U.S.P.Q. 258 (3d Cir. 1973). Although conceding that "the evidence adduced in the summary judgment proceedings seems heavily weighted in favor of Ransburg," 484 F.2d at 1039, the Court of Appeals nevertheless concluded that the issue of whether defendant sufficiently controlled a prior suit as to be bound by the doctrine of *res judicata* presented a controverted question requiring resolution by the court as a finder of fact.

On the eve of trial, plaintiff and the defendant purchaser, Lansdale Finishers, Inc., reached a settlement. At plaintiff's request, and with the consent of the remaining defendant, Automatic Finishing Systems, Inc., the case was tried to the court solely on the issue of defendant's control of prior litigation.

2. On April 20, 1972, plaintiff amended its charter to effect a change in its name from Ransburg Electro-Coating Corporation to simply Ransburg Corporation. The caption has been amended to reflect that change.

3. The precise patents involved are Nos. 2,685,-536; 2,794,417; 2,893,893; and 2,893,894, of which Ransburg is the undisputed owner.

4. But see Finding of Fact No. 4 infra.

forceable, and infringed by Standard's utilization of the AFS System.

9. Although AFS was not a formal party to the Standard suit, the court found AFS to be guilty of inducement and contributory infringement, and enjoined further such infringement.

10. Although a notice of appeal was filed, it was not pursued, Ransburg and Standard ultimately arriving at a settlement. On January 5, 1971, the Georgia court entered an order making the Interlocutory Judgment final.

11. Chief Judge Bootle, before whom *Standard* was tried, was aware of the instant action against AFS. Accordingly, he made certain findings concerning AFS' participation in the suit against Standard, including the following:

5. Automatic Finishing Systems, Inc. ("AFS"), a New Jersey corporation with its principal place of business in Palmyra, New Jersey, manufactured the accused electrostatic spray coating system and sold it to defendant (Tr. 3). AFS has actively and openly assisted in the defense of this action. (PX 53, p. 146–52, 170, 248, 235–55, 269; PX 54, p. 34–42; Tr. 506–12, 521).

6. AFS agreed with defendant that AFS would pay all litigation costs in the present action (Tr. 506; PX 54, p. 34, 39) including the fees of an expert witness, Dr. Kusko (Tr. 507), and any damages which may be assessed against defendant (Tr. 506). Defendant's trial counsel has also been retained by AFS to defend an action brought by Ransburg against AFS in Philadelphia (Tr. 506), and AFS has agreed to pay his fees in both cases. No officer or employee of defendant appeared as a witness or attended the trial of this case, but the president (Tr. 501) of AFS, Gallen, and one of its key employees (Tr. 501), Monroe, were daily present in court, while an AFS vice-president, Lanchak (Tr. 502) attended portions of the trial. The tests used to develop much of defendant's evidence (e. g. DX 23, 24, 37 & 38) were conducted at Lanchak's place of business in New Jersey (Tr. 520–

21), and no employee or officer of defendant was present at the tests (Tr. 521).

7. Ransburg's interrogatories (PX 55) and requests for admissions (PX 56) were never submitted to defendant for consideration because defendant's counsel knew that defendant had no information relating to them (PX 54, p. 50); rather, draft responses were prepared by trial counsel and submitted to Gallen (Tr. 508–10) and Monroe (PX 51, p. 64) for their opinion, after which they were signed by trial counsel. The accused system, which was purchased from AFS in 1965 (Tr. 473), was used by defendant in New Jersey for approximately 3 months (PX 51, p. 7) and in Homerville, Georgia, for one, possibly two, seasons (PX, p. 30). Defendant's stake in this action is less than that of AFS. At one time defendant's counsel indicated that AFS might attempt to intervene, but such attempt did not materialize.

12. Chief Judge Bootle refused Ransburg's request for a finding that AFS actually controlled the defense in *Standard*. Reasoning that such a finding would not be binding upon any other court which might be confronted with the question, he stated:

It's better to leave such Court untrammeled. Such Court before whom res judicata or collateral estoppel is urged may be in a better position than this Court to make a correct finding on this question because it may have the benefit of additional facts. See *Marshall Metal Products v. Aghnides*, 126 F.Supp. 849 [850] (S.D.N.Y.1954); *Schnell v. Eckrich & Sons*, 365 U.S. 260, 81 S.Ct. 557 [5 L.Ed.2d 546] (1961); *Minneapolis-Honeywell Regulator Co. v. Thermoco, Inc.*, 116 F.2d 845 (2d Cir. 1941); 1B MOORE'S FEDERAL PRACTICE, ¶ 0.411[6] at 1571. But see *Brock v. Brown*, 138 F.Supp. 628 (D.Md.1956).

13. At trial of the instant action, Thomas Gallen, president of AFS, admitted he had no basis for denying the accuracy of Chief Judge Bootle's findings 5 through 7 with one exception, specifically that Dana

Raymond, Esquire, defendant's trial counsel in the suit before Chief Judge Bootle, had also been retained by AFS in the instant case.

14. Testimony by both Mr. Raymond and Mr. Gallen denying that Mr. Raymond had been retained to represent AFS in the present suit[5] sharply conflicts with previous statements made by both men.

15. In a deposition taken in the *Standard* suit in July, 1969, Mr. Raymond stated that his appearance had also been entered in the suit brought by Ransburg against AFS in Philadelphia. And in his opening statement in the *Standard* trial, he advised Chief Judge Bootle, "I am of counsel for AFS in the Philadelphia action."

16. Prior to trial of the case at bar, AFS admitted in response to Ransburg's Request No. 11 that the same counsel originally had been retained to defend both suits although this arrangement was "changed recently due to a shortage of funds." Moreover, Mr. Gallen stated flatly at the *Standard* trial that he had hired Mr. Raymond as his counsel. In a deposition taken for the present case, Mr. Gallen acknowledged there "was a meeting of the minds" as early as July, 1969 (well before the *Standard* trial), that Mr. Raymond would represent AFS in this suit, and that Mr. Raymond ceased to represent AFS only after the decision was made not to pursue the appeal in *Standard.*

17. Even if Rule 36(b), Fed.R.Civ.P.,[6] would permit AFS to disavow Admission 11, independent evidence demonstrates that AFS engaged Mr. Raymond to represent it in this action until a shortage of funds on the part of AFS forced his withdrawal.[7]

18. The significant degree to which AFS participated in Standard's defense in the Georgia suit is in marked contrast with Standard's own conduct. William M. Vogel, Jr., the president of Standard, testified that his company preferred not to become involved in the matter. He stated that since AFS had agreed to pay all expenses he had no objections to Mr. Raymond's litigating the suit, but that for its part, Standard would pay nothing.[8] No one at Standard was regularly apprised of the progress of the suit, nor did any employee of Stan-

---

5. Mr. Raymond testified:

> "No, I have had nothing to do with that suit. I never had a retainer. I don't believe I saw the papers that were filed. There may have been some copies sent to my office. I have had nothing to do with that suit, however, until recently when I have conversed with you on the matter of testifying here today. * * * I have a recollection that Mr. Kryzinski [an AFS attorney] did suggest that and informed me, I believe, that my name had been put on the record here. But that's all. That's the totality of it."

N.T. Jan. 10, 1975, 220.

6. That rule provides:

> Any matter admitted under this rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission. Subject to the provisions of Rule 16 governing amendment of a pretrial order, the court may permit withdrawal or amendment when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice him in maintaining his action or defense on the merits. Any admission made by a party under this rule is for the purpose of the pending action only and is not an admission by him for any other purpose nor may it be used against him in any other proceeding.

7. The credibility of Mr. Gallen's present testimony also is weakened by his statement that he had not, until recently, even thought about control. He had in fact been present in the courtroom at all times during the *Standard* trial, where Judge Bootle stated, "Your opponent contends that AFS is really a defendant to this litigation, not on the record but financing the defense and furnishing the witnesses."

After the conclusion of the trial of this matter, defendant submitted to this Court a document entitled "Defendant's Memorandum on Particular Feature of Ransburg's Proposed Findings of Facts." The thrust of this memorandum is that plaintiff's proposed findings concerning the reliability of the testimony of Messrs. Raymond and Gallen are unsupported by the record. After careful review, I conclude that plaintiff's findings, which are meticulously documented to the record, are correct. The remainder of defendant's arguments in this memorandum are hypothetical assertions totally unrelated to the record.

8. Standard's only expenditure in this matter was, aside from its ultimate settlement with Ransburg, approximately $1300. for the services of its Atlanta counsel.

dard assist in the preparation for trial or attend the trial. After the court rendered its decision, Mr. Vogel sent Ransburg's settlement proposal to Mr. Gallen because "[s]ince he was in charge of litigating or they had taken over the suit finally as we were involved in, I thought he should have this information."

19. AFS actively and openly assisted in the *Standard* defense. Draft responses to interrogatories and requests for admissions were submitted by Mr. Raymond to Mr. Gallen for his opinion. Mr. Gallen made written suggestions for tests, and tests were conducted at the plant of an AFS stockholder. Mr. Gallen hired a photographer for these tests, and paid the fees of Standard's expert witness. Prior to trial, Mr. Raymond had numerous communications with AFS and its Atlanta attorney, Leo C. Krazinski, Esquire, which communications included requests for comments and "plans on how to proceed." Mr. Gallen and another AFS employee were continuously in court during the *Standard* trial, and the vice-president of AFS attended part of the trial.

20. When the district court rendered its decision adverse to Standard, Mr. Raymond sent a copy of the opinion to Mr. Gallen, with the comment: "Here is a copy of the bad news. As you know, I am stunned. I will be in touch with you soon on what course to pursue." Mr. Gallen responded with extensive written comments on the decision.

21. After the *Standard* trial, Mr. Raymond sent AFS a single bill—covering all services and disbursements—in the amount of $38,500. AFS made a single payment of $500., leaving Mr. Raymond with an unpaid balance of $38,000. Without ever discussing the unpaid bill with Mr. Gallen, Mr. Raymond has written it off.

22. Although Standard was Mr. Raymond's titular client, and although he could not have been bound by any private arrangement between AFS and Standard, he never attempted to collect from Standard, and Standard paid him nothing. Indeed, he never even made known to Standard the amount of his bill.

23. After the adverse decision in *Standard*, by the district court, Mr. Raymond filed a notice of appeal, but when it became apparent that AFS could not afford to continue to finance the case, the appeal was dropped.[9]

24. When Standard realized that it might have to pay a large bill, it ordered Mr. Raymond to bring the matter to a halt. Mr. Raymond was not privy to any discussions at Standard concerning pursuit of the appeal, nor was he involved in the settlement between Ransburg and Standard; he was simply told to drop the appeal.

25. Although Mr. Gallen recognized that the decision not to pursue an appeal was detrimental to AFS, he made no inquiries. As he testified, "I felt when you owe people so much it is kind of hard to even talk to them."

26. In all important respects, AFS controlled the conduct of *Ransburg Electro-Coating Corp. v. Standard Container Co.*, supra, and Standard exercised no control whatever. The instant case and *Standard* involve identical patents, identical causes of action, and identical claims for relief.

---

**9.** AFS admitted:

> We did not refuse to assure Standard Container payment of costs, but having lost the suit unexpectedly, we also lost large sales that would have enabled Standard Container and anyone else involved to accept our assurance.
>
> Standard Container called us, less than one week before the briefs for the appeal were to be filed and said that the appeal briefs were not going to be filed. I checked with Mr. Raymond and he confirmed this fact. He was aware of the sales lost due to the Georgia decision and finally could not accept our assurance of being paid, though he knew we were working on it.

When questioned about this admission, Mr. Gallen testified:

> ". . . to this day I don't know if that's the reason the appeal was dropped because we couldn't afford it [sic] . . . I am assuming in here that the suit was dropped because we could not be expected to pay for it."

## DISCUSSION

The well-settled rule of law, as contained in Section 84 of the Restatement of Judgments, is that:

[a] person who is not a party but who controls an action individually or in co-operation with others, is bound by the adjudications of litigated matters as if he were a party if he had a proprietary or financial interest in the judgment or in the determination of a question of fact or of a question of law with reference to the same subject matter or transaction; if the other party has notice of his participation, the other party is equally bound.[10]

The rationale for the rule is, of course, that an individual is entitled to only one adjudication of a cause of action or of an issue where he has control of the proceedings. Where a non-party has control over or participates in the control of the proceedings, it is not unfair that the judgment or adjudication should determine the existence and the extent of interests which are dependent upon the determination of issues in the action leading to the judgment. Restatement of Judgments § 84, comment *a*.

Central to the invocation of this principle is the factual question of the sufficiency of the non-party's control and participation in the litigation. The burden of affirmatively proving sufficient control rests upon the party seeking to invoke the conclusive force of the judgment. 1B *Moore's Federal Practice* ¶ 0.411[6] at 1567. Merely instigating litigation, even coupled with activity as an amicus curiae, is insufficient to establish control. Nor is a non-party's participation sufficient if he merely assists or cooperates in the prosecution or defense by providing funds for the payment of expenses of litigation. Restatement of Judgments § 84, comment e; 1B *Moore's Federal Practice* ¶ 0.411[6], at 1565.[11] That a non-party in a patent case well may elect to go much further than merely funding legal expenses, however, was recognized in *Bros., Inc. v. W. E. Grace Mfg. Co.*, 261 F.2d 428 (5th Cir. 1958), where the court said:

This is particularly so in patent infringement cases in which, from tactical or strategic considerations relating to venue, desirability of a particular forum and the like, such cases are so often filed and tried against a dealer, a seller, a distributor, or a user of the accused device manufactured by another. If the manufacturer stands aloof, he risks a judgment adverse to his interest resulting perhaps from inadequate or incompetent defense by one who has a secondary interest. Such judgment, to be sure, would normally not be binding by estoppel or *res judicata*, but it would take its place in the jurisprudence where its practical effect as stare decisis might be as decisive. The alternative, of course, is to jump in and give the case full and active defense as though the manufacturer were the real named party. This assures that the issues will be presented and contested in a way deemed most effective by the nominally remote, but practically immediate, party at interest.

Where that course is followed and the non-party actively and avowedly conducts the defense, manages and directs the progress of the trial at its expense and under its supervision, the outcome, which if favorable would have redounded to his benefit, if adverse becomes sauce for

10. See, e. g., *Schnell v. Peter Eckrich & Sons, Inc.*, 365 U.S. 260, 262 n. 4, 81 S.Ct. 557, 559 n. 4, 5 L.Ed.2d 546, 548 (1961); *Souffront v. La Compagnie des Sucreries*, 217 U.S. 475, 487, 30 S.Ct. 608, 54 L.Ed. 846, 851 (1910); *Lovejoy v. Murray*, 3 Wall. 1, 70 U.S. 1, 18 L.Ed. 129 (1865); *Ark-Tenn Distributing Corp. v. Breidt*, 209 F.2d 359, 361 (3d Cir. 1954); *Caterpillar Tractor Co. v. International Harvester Co.*, 120 F.2d 82, 84–85 (3d Cir. 1941); *Manville Boiler Co. v. Columbia Boiler Co. of Pottstown*, 204 F.Supp. 385, 387 (E.D.Pa.1962); 1B *Moore's Federal Practice* ¶ 0.411[6] at 1559–67.

11. Accord, *Tidewater Patent Development Co. v. Kitchen*, 421 F.2d 680, 681 (4th Cir. 1970); *Guillot v. Cenac Towing Co.*, 366 F.2d 898, 906 (5th Cir. 1966); *Simon v. Maryland Casualty Co.*, 353 F.2d 608, 612 (5th Cir. 1965); *Thaxton v. Vaughan*, 321 F.2d 474, 479 (4th Cir. 1963); *Bros., Inc. v. W. E. Grace Mfg. Co.*, 261 F.2d 428, 430 (5th Cir. 1958); *Sheldon v. Amperex Electronic Corp.*, 52 F.R.D. 1, 11 (E.D.N.Y. 1971); *Foster Wheeler Corp. v. Aqua-Chem, Inc.*, 277 F.Supp. 382 (E.D.Pa.1967).

goose and gander alike, and binding under principles of *res judicata*. [citations omitted].

*Id.* at 430.

■ Equally inadequate, in Professor Moore's view, is a showing that the non-party provided counsel or procured witnesses or evidence unless by such assistance he acquired the requisite degree of control. The prerogative to decide whether or not to appeal from an adverse appeal is crucial to, and indicative of control. However, as previously mentioned and emphasized by the Restatement and Professor Moore, the non-party's control need not be absolute. Joint control by non-parties or in conjunction with a party is sufficient. Even the fact that the party whose action or defense the non-party controls could withdraw consent to his exercise of control and therefore terminate the non-party's control at any time does not affect the rule. "[A]s long as such consent exists, the control is as effective as if the consent were non-terminable." Restatement of Judgments § 84, comment e.

■ Guided by these principles, I cannot but conclude that AFS exercised sufficient control over Standard's defense in the Georgia action as to dictate that AFS be bound by the judgment therein. From the outset, Standard abdicated all responsibility with respect to the defense of the suit. As long as AFS was able and willing to foot the bills, Standard fully acquiesced in its litigation of the suit. AFS has produced not even a scintilla of evidence to show that Standard had any control whatever over the conduct of the matter. On the contrary, it was Thomas Gallen who expended enormous time and efforts in preparing for and attending the trial. It was Mr. Gallen with whom Dana Raymond collaborated in preparation for the lawsuit, and with whom he communicated after the district court rendered its decision. And it was Thomas Gallen who; had he possessed adequate funds, would have pursued the appeal.

That Standard ultimately ordered Mr. Raymond to halt the appeal is inconsequential. Had Mr. Gallen been able to fund an appeal, all available evidence implies that Standard would have been perfectly willing to allow him to do so. The decision not to appeal was, as a practical matter, Mr. Gallen's decision, dictated as it was by his economic predicament. Put succinctly, since Mr. Gallen could not afford to appeal, Standard opted to settle. Mr. Gallen and his associates exercised as much control as any party to the Georgia action could have; they "jumped in and gave the case full and active defense," to borrow Judge Brown's language. Accordingly, AFS must be bound by the Georgia determination.

Subsequent to trial the parties have engaged in a battle of memoranda in which two additional issues were controversed— first, whether this court erred in not deciding the claim of estoppel on the basis of *Ransburg Electro-Coating Corp. v. Ionic Electrostatic Corp.*, supra; and second, whether the court erred in refusing to allow the defendant to attack the validity of Ransburg's patents with certain so-called "Russian documents."

■ By virtue of the *Standard* decision, AFS is precluded from pleading the decision in *Ionic* under the collateral estoppel doctrine. In Finding No. 79, Chief Judge Bootle stated that the defendant had "focused primary attention upon the decision on the Ionic contempt appeal." The court in *Standard* concluded, however, that Automatic's system differed from the "devices under consideration in the [*Ionic*] contempt appeal in the very respects held to be critical in that decision." 167 U.S.P.Q. at 440. The court further found that the AFS system did not meet the *ratio decidendi* of the *Ionic* decision.[12] On the basis of these findings, coupled with my conclusion that AFS controlled the defense in *Standard*, defendant is estopped from again raising the *Ionic*

---

**12.** Chief Judge Bootle found that in AFS's system, unlike Ionic's, there was substantial dependence upon electrostatic forces for achieving atomization, that electrostatic forces play a large part in the atomization of the paint, and that high rotational speeds do not eliminate the effect of the electrostatic forces. 167 U.S.P.Q. at 437, 440.

decision or contending that its system is identical to the devices under consideration there. To put it bluntly, AFS litigated those issues in *Standard* and lost. It cannot relitigate them in this court.

■ Of the "Russian Documents" little need be said. Defendant argues that through them the invalidity of Ransburg's patents could be shown. However, the validity question vis-a-vis the "Russian Documents" was subsumed in the general question of the validity of Ransburg's patents before the district court in *Standard*.[13] These documents were available to AFS and Standard Container and could have been raised as part of the invalidity defense in the Georgia trial.[14] AFS may not at this late date attack the validity of Ransburg's patents by now resorting to the "Russian Documents."

Subsequent to the trial in this matter, the Court of Appeals for this Circuit decided *Kaiser Industries Corp. v. Jones & Laughlin Steel Corp.*, 515 F.2d 964, 185 U.S.P.Q. 343 (3d Cir.), cert. denied, 423 U.S. 876, 96 S.Ct. 150, 46 L.Ed.2d 110 (1975).[15] In *Kaiser* certain patent holders brought suit in the Western District of Pennsylvania seeking royalties for alleged infringement. The

patent at issue previously had been declared *invalid* by the United States District Court for the Eastern District of Michigan and affirmed by the Court of Appeals for the Sixth Circuit. When the plaintiff subsequently asserted the same patent in the Pennsylvania action, the defendant, relying upon the opinion of the Supreme Court in *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), raised the defense of collateral estoppel.[16] After an exhaustive review of the prior proceeding, the district court found that the Sixth Circuit courts had "wholly failed to grasp technical subject matter and issues in suit," and accordingly rejected the defense of collateral estoppel.

In reversing the decision of the district court, the court of appeals held that *Blonder-Tongue*, "does not authorize an unbridled excursion into the record of the earlier trial before applying the estoppel of the previous judgment." 515 F.2d at 987. Rather a second court must

> confine its inquiries to proper bounds, namely whether the [first] court displayed an understanding of the issues presented, adequately considered the evi-

**13.** As Professor Moore observes:
> A new contention is not . . . necessarily a new issue. If a new legal theory or factual assertion put forward in the second action is "related to the subject-matter and relevant to the issues" that were litigated and adjudicated previously, "so that it could have been raised, the judgment is conclusive on it despite the fact that it was not in fact expressly pleaded or otherwise urged." The analogy to the rule against splitting a single cause of action is striking. Like a cause of action, "an issue may not be . . . split into pieces. If it has been determined in a former action, it is binding notwithstanding the parties litigant may have omitted to urge for or against it matters which, if urged, would have produced an opposite result." Any contention that is necessarily inconsistent with a prior adjudication of a material and litigated issue, then, is subsumed in that issue and precluded by the prior judgment's collateral estoppel effect [footnotes omitted].
> 1B *Moore's Federal Practice* ¶ 0.443[2], at 3903–04.

**14.** Indeed, at page 808 of the *Standard* trial transcript, Mr. Raymond specifically dropped

Russian Author's Certificate No. 57220 which he previously had designated as an exhibit.

**15.** Because of the arguable impact of the *Kaiser* decision upon the matter at hand, I invited counsel to submit whatever comments they might deem appropriate. Both sides have done so, and I have accorded full consideration to the views expressed in their respective responses.

**16.** The Supreme Court held in *Blonder-Tongue* that a prior adjudication of invalidity may be asserted as a defense to a subsequent attempt to enforce the patent, and that such a defense must be accepted unless it is demonstrated that the patentee was denied a full and fair opportunity to litigate the prior action. *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 330–50, 91 S.Ct. 1434, 1443–53, 28 L.Ed.2d 788, 800–811 (1971); see *Kaiser Industries Corp. v. Jones & Laughlin Steel Corp.*, 515 F.2d 964, 966, 185 U.S.P.Q. 343 (3d Cir.) cert. denied, 423 U.S. 876, 96 S.Ct. 150, 46 L.Ed.2d 110 (1975).

dence presented, and the governing principles of law.

*Id.*

Defendant asserts that *Blonder-Tongue* and *Kaiser* constitute authority for according it collateral estoppel benefit of the Fourth Circuit contempt decision in the *Ionic* case. For several reasons, I conclude that neither *Blonder-Tongue* nor *Kaiser* has application to the case *sub-judice*. First of all, defendant cannot make the threshold showing that its accused systems are in fact identical to the *Ionic* systems which were held noninfringing by the Fourth Circuit Court of Appeals.[17] Next, the Fourth Circuit judgment was one of noninfringement rather than invalidity.[18] Finally, even if *Blonder-Tongue* could be extended to permit a defense of collateral estoppel based upon a prior holding of noninfringement, and even if defendant here could make the required showing of identity between its accused systems and the *Ionic* systems involved in the Fourth Circuit litigation, AFS still would not prevail, since among the defenses specifically raised in the Georgia suit was an allegation of collateral estoppel against the plaintiff arising from *Ionic*. That matter was, therefore, actually raised and rejected in the Georgia case.

Accordingly, on the basis of the foregoing findings of fact and discussion, I make the following:

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the parties and the subject matter of this action pursuant to 28 U.S.C. § 1338(a), and venue is properly laid in this district under 28 U.S.C. § 1400(b).

2. Each of the patents in this suit was lawfully and duly issued, each is owned by plaintiff and plaintiff has standing to sue to recover for past infringement and to enjoin future infringement thereof.

3. Inasmuch as AFS controlled the defense in *Ransburg v. Standard Container Co.*, supra, the judgment therein is *res judicata* as to AFS. Accordingly, AFS is precluded here from litigating any matters which were or which could have been decided in *Standard*, including validity and enforceability of the patents in suit, infringement thereof by the accused AFS system, and collateral estoppel by virtue of the judgment in *Ransburg v. Ionic Electrostatic Corp.*, supra.

4. The accused AFS system meets every requirement of claims 3 and 4 of United States Patent No. 2,794,417; Claims 9 and 10 of United States Patent No. 2,893,893; and Claims 7 and 8 of United States Patent No. 2,893,894. The sale of its system by AFS to Standard and others thereby directly infringed those patents. 35 U.S.C. § 271(a).

5. AFS has actively induced infringement of each of the patents in suit by its manufacture and sale of atomizer heads and other components to Standard and others for use in the accused system. 35 U.S.C. § 271(b).

6. AFS has contributed to infringement of each of the patents in suit by selling to Lansdale Finishers, Inc., for use in the accused system, atomizer heads which are not staples of commerce suitable for substantial non-infringing use. 35 U.S.C. § 271(c).

7. Ransburg is entitled to judgment against AFS.

8. AFS and its officers, agents, servants, employees, and attorneys, and all those in active concert or participation with them must be permanently enjoined from

---

17. Indeed, as stated previously in the text, Judge Bootle held that the automatic system at issue in the Georgia suit differed from the "devices under consideration in the [*Ionic*] contempt appeal in the very respects held to be critical in that decision." *Ransburg Electro-Coating Corp. v. Standard Container Co.*, 167 U.S.P.Q. 426, 440 (M.D.Ga.1970). The accused system here is, of course, identical to that in dispute in the Georgia action.

18. As previously recited, the Ransburg patents at issue here never have been declared invalid. Indeed, District Courts in the Fifth and Eighth Circuits and Courts of Appeals in the Fourth and Eighth Circuits have expressly found them to be valid. See Finding of Fact No. 3, supra.

further acts of infringement of United States Patents Nos. 2,893,893 and 2,893,894.

9. Ransburg is entitled to an accounting against AFS to determine the amount of its damages.

10. Ransburg is entitled to an award of ordinary costs against AFS.

11. The Counterclaim of AFS must be dismissed with prejudice.